# Illinois Official Reports

## Appellate Court

***Illinois Insurance Guaranty Fund v. Priority Transportation, Inc.,***
**2019 IL App (1st) 181454**

| | |
|---|---|
| Appellate Court Caption | ILLINOIS INSURANCE GUARANTY FUND, Plaintiff-Appellee, v. PRIORITY TRANSPORTATION, INC., f/k/a Transit Group, Inc.; TRANSIT GROUP TRANSPORTATION, LLC, a/k/a 1999 TGT Merger Sub, Inc.; TIM WITTE; and ACE INSURANCE COMPANY, Defendants (Priority Transportation, Inc., f/k/a Transit Group, Inc.; Transit Group Transportation, LLC, a/k/a 1999 TGT Merger Sub, Inc.; and Ace Insurance Company, Defendants-Appellants). |
| District & No. | First District, Fourth Division<br>No. 1-18-1454 |
| Rehearing denied<br>Opinion filed | October 4, 2019<br>October 24, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-16558; the Hon. David B. Atkins, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | John P. Bergin and Peter J. Lorenz, of Lorenz & Bergin, P.C., of Chicago, for appellants.<br><br>J. Murray Pinkston III, of Stone & Johnson, Chtrd., of Chicago, for appellee. |

Panel    JUSTICE BURKE delivered the judgment of the court, with opinion. Presiding Justice Gordon and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1    Tim Witte was employed as a truck driver by Fox Midwest Transport, Inc. (Fox Midwest), which from March 1, 1999, until March 1, 2000, had a workers' compensation policy issued by Fremont Casualty Insurance Company (Fremont). On December 31, 1999, Fox Midwest merged into 1999 TGT Merger Sub, Inc., a subsidiary of Transit Group, Inc., a trucking business, that itself had a workers' compensation policy issued by Ace Insurance Company (Ace), effective from January 1, 2000, until January 1, 2001. On January 17, 2000, Witte sustained injuries on the job and later filed a workers' compensation claim. Fremont began paying him benefits until July 2, 2003, when it was involuntarily liquidated by the State of Illinois. Thereafter, the Illinois Insurance Guaranty Fund (Fund) became the provider of benefits to Witte and has provided him benefits ever since.

¶ 2    Several years later, the Fund sued Priority Transportation, Inc. (formerly known as Transit Group, Inc.), and Transit Group Transportation, LLC (also known as 1999 TGT Merger Sub, Inc.) (collectively, the Transit Group entities), along with Witte and Ace. The Fund alleged that, because of the merger, the Transit Group entities were Witte's employer and that they had a workers' compensation policy covering their employers through Ace. As such, the Fund contended there was other workers' compensation insurance coverage available to Witte and sought declarations that the Transit Group entities and Ace should be responsible for the benefits paid and payable to Witte as a result of his workplace accident. The Transit Group entities and Ace filed a joint motion to dismiss, arguing that the circuit court lacked subject-matter jurisdiction to entertain the Fund's claims. Thereafter, the Fund, the Transit Group entities, and Ace filed cross-motions for summary judgment. Following a hearing on all of the motions, the circuit court denied the motion to dismiss, finding it had subject matter jurisdiction to entertain the Fund's claims. And the circuit court granted the Fund's motion for summary judgment and denied the motions for summary judgment of the Transit Group entities and Ace, finding that, because of the merger, Witte was covered under the workers' compensation insurance policy of the Transit Group entities at the time of his injury.

¶ 3    The Transit Group entities and Ace appealed, contending that the circuit court erred in denying their joint motion to dismiss and their motions for summary judgment and erred in granting the Fund's motion for summary judgment. For the reasons that follow, we affirm all of the circuit court's judgments.

¶ 4                                    I. BACKGROUND
¶ 5                          A. The Illinois Insurance Guaranty Fund
¶ 6    Before delving into the history of this case, we briefly provide a background about workers' compensation benefits and the Fund. The principal purpose of the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2000)) is to provide financial protection for workers injured during the course and scope of their employment. *Cassens Transport Co. v. Illinois Industrial Comm'n*, 218 Ill. 2d 519, 524 (2006). Pursuant to the goal of protecting workers

financially, the Act was written to provide prompt and fair recovery without proof of fault for workers who are accidentally injured in the workplace (*Fregeau v. Gillespie*, 96 Ill. 2d 479, 486 (1983)), but also to protect employers from the prospects of civil litigation by its employees (see *Mitsuuchi v. City of Chicago*, 125 Ill. 2d 489, 494 (1988)). This goal, however, can be frustrated when the workers' compensation insurer becomes insolvent, cannot provide benefits to an injured worker, and has placed no adequate bond with the Illinois Industrial Commission.

¶ 7 Due to the possibility of the insolvency of a workers' compensation insurer, in addition to various other types of insurance providers, the Illinois Insurance Code created the Fund (215 ILCS 5/532 to 553 (West 2000)), a nonprofit entity that protects holders of policies issued by insurers that become insolvent "and third-party claimants under those policies, when expected coverage ceases to exist." *Rogers v. Imeri*, 2013 IL 115860, ¶ 14. The Fund is not intended to be an independent or collateral source of insurance benefits, but rather is " 'a source of last resort,' whose role as a substitute insurer is subject to certain statutory limitations." *Id.* (quoting *Illinois Insurance Guaranty Fund v. Farmland Mutual Insurance Co.*, 274 Ill. App. 3d 671, 673 (1995)). In other words, when a claimant is receiving insurance benefits and his insurer becomes insolvent, the Fund steps into the shoes of the insurer to maintain the position of the claimant. *Skokie Castings, Inc. v. Illinois Insurance Guaranty Fund*, 2013 IL 113873. ¶ 29. But because the Fund is a source of last resort, a claimant must exhaust all rights he has under any other insurance policy applicable to his claim or loss. 215 ILCS 5/546(a) (West 2000); *Hasemann v. White*, 177 Ill. 2d 414, 418 (1997).

¶ 8                                  B. The History of the Case
¶ 9 The following is a history of the parties involved, taken from the documents relied upon by both parties in their cross-motions for summary judgment.

¶ 10 During the late 1990s, Transit Group, Inc., was in the process of acquiring trucking companies across the United States in order to create a nationwide transportation network. According to the deposition of Paul Kostelac, the former vice president of risk management of Transit Group, Inc., to facilitate certain acquisitions, particularly for tax reasons, Transit Group, Inc., would use subsidiary entities to perform the acquisitions. Kostelac asserted that the subsidiaries were merely "legal vessel[s]" to effectuate the acquisitions and that the acquisitions would "roll" into Transit Group, Inc., "very rapidly," as "[g]enerally it just [took] time to get the lawyers together to get the paper completed and get it signed."

¶ 11 In May 1999, Tim Witte, a truck driver, began working for Fox Midwest and continued working for them into December 1999 when Transit Group, Inc., was in the process of acquiring Fox Midwest through a statutory merger. At this time, Fox Midwest had a workers' compensation policy through Fremont, which was in effect from March 1, 1999, to March 1, 2000. To facilitate the acquisition of Fox Midwest, Transit Group, Inc., created a subsidiary, 1999 TGT Merger Sub, Inc. (TGT Merger).

¶ 12 According to a "Certificate of Merger of Fox Midwest Transport, Inc. into 1999 TGT Merger Sub, Inc," dated December 23, 1999, Fox Midwest was a Wisconsin corporation, and TGT Merger was a Delaware corporation. The certificate stated that an "Agreement and Plan of Merger" had been approved and the "surviving corporation of the merger" would be TGT Merger.

¶ 13     In the "Agreement and Plan of Merger," there was a section titled "Effect of Merger," that stated:

> "At the conclusion of the Merger, (a) the separate existence of Fox [Midwest] will cease and Fox [Midwest] will be merged with and into [TGT Merger] and [TGT Merger] will be the surviving corporation pursuant to the terms of the Certificate of Merger."

Another section of the agreement was titled "Rights and Liabilities of Fox [Midwest]," which stated:

> "At and after the Merger, without further act or deed, all of the rights, privileges and powers, and all of the property, real, personal and mixed of, and all debts due to Fox [Midwest], as well as all of the things and causes of action belonging to Fox [Midwest] shall be the property of [TGT Merger] as they were the property of Fox ***; all rights of creditors and all liens upon any property of any of the parties hereto shall be preserved, unimpaired, and all debts, liabilities, and duties of the respective parties hereto shall thenceforth attach to [TGT Merger] and may be enforced against it to the same extent as if such debts, liabilities, and duties had been incurred or contracted by it."

The agreement declared that the merger would become effective just before midnight on December 31, 1999.

¶ 14     Meanwhile, Transit Group, Inc., had its own workers' compensation policy through Pacific Employers Insurance Company, a company that Ace had acquired. The policy of Transit Group, Inc., commenced on January 1, 2000, and was in effect until January 1, 2001. The policy named "Transit Group, Inc.," as the insured but also included multiple "Other Insureds Extension" pages, listing several other entities, including "Transit Group Transportation, LLC," and other entities that Transit Group, Inc., had acquired during the late 1990s. Fox Midwest's name was not included as another insured. And the policy covered "TRUCKING IL" as a workplace. According to the policy, the premiums required by Ace were only an estimate and the final premium would "be determined after" the policy period ended "by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy."

¶ 15     On January 17, 2000, Witte was on the job in Illinois, near or in Itasca, when he stepped out of his truck, slipped, and fell on ice, which resulted in injuries to his head, knee, and shoulder. Following the accident, he filed a workers' compensation claim with the Illinois Industrial Commission, whose name later was changed to the Illinois Workers' Compensation Commission (Commission), and began receiving compensation from Fremont based on Fox Midwest's policy.[1] Fremont continued to pay Witte workers' compensation benefits until July 2, 2003, when the company was involuntarily liquidated by the State of Illinois. At this time, the Fund took over as Witte's benefit provider.

¶ 16     Meanwhile, documentary evidence and deposition testimony demonstrate that Fox Midwest was expressly added to the workers' compensation policy of Transit Group, Inc., on

---

[1]The name change occurred in January 2005. See *Roberson v. Industrial Comm'n*, 225 Ill. 2d 159, 162 n.1 (2007) (citing 820 ILCS 305/1(c) (West 2004)).

March 1, 2000.

¶ 17                                 C. The Complaint

¶ 18        At issue in this case is the Fund's amended two-count complaint for declaratory judgment against the Transit Group entities (Priority Transportation, Inc., and Transit Group Transportation, LLC), Witte, and Ace.

¶ 19        According to count I of the amended complaint, on or before December 31, 1999, Transit Group Transportation, LLC (also known as 1999 TGT Merger Sub, Inc., or as TGT Merger in this opinion), was a subsidiary of Priority Transportation, Inc. (formerly known as Transit Group, Inc.). The amended complaint asserted that, on December 31, 1999, Fox Midwest merged into TGT Merger, and following the merger, Fox Midwest ceased to exist as a separate corporate entity. The amended complaint alleged that, because there was no entity known as Fox Midwest, Witte was employed by TGT Merger at the time of his January 17, 2000, workplace accident. Count I therefore "demand[ed] judgment against [the Transit Group entities] for declaration that [the Transit Group entities] are responsible" for the workers' compensation benefits paid to and owed to Witte in connection with his workplace accident.

¶ 20        According to count II of the amended complaint, on or before December 31, 1999, Ace issued a workers' compensation policy to Transit Group, Inc., the parent company of TGT Merger. The amended complaint asserted that, after Witte's January 17, 2000, workplace accident, Fremont, which had issued a workers' compensation policy to Fox Midwest, began paying out benefits to Witte until Fremont was involuntarily liquidated by the State of Illinois, at which point the Fund began providing Witte benefits. Count II claimed that Transit Group, Inc., and TGT Merger had their own workers' compensation policy and, under article XXXIV of the Illinois Insurance Code (215 ILCS 5/532 to 553 (West 2000)), that coverage was primary to the coverage provided by the Fund and should have been exhausted prior to the Fund being responsible for Witte's benefits. Count II therefore "demand[ed] judgment against [the Transit Group entities] and Ace for declaration that [the Transit Group entities] and Ace are responsible" for the workers' compensation benefits paid to and owed to Witte in connection with his workplace accident.

¶ 21        All of the defendants filed answers. In particular, the Transit Group entities and Ace filed individual answers, through the same attorney, and in response to nearly every allegation in the Fund's amended complaint. They denied the allegations or asserted that they had insufficient knowledge to either deny or admit the allegations. And in response to the amended complaint's allegation in count I that Transit Group Transportation, LLC, was also known as TGT Merger, the Transit Group entities and Ace each answered, "Defendant denies the allegations ***, and demands strict proof thereof." And in response to the amended complaint's allegation in count II that Transit Group Transportation, LLC, was also known as TGT Merger, the Transit Group entities and Ace each answered, "Defendant has insufficient knowledge to either deny or admit the allegations ***, and demands strict proof thereof."

¶ 22        During discovery, the parties exchanged various documents, including the workers' compensation policy, covering Fox Midwest, issued by Fremont and the workers' compensation policy covering Transit Group, Inc., issued by Ace. In the Fremont policy, there were no change-of-control or anti-assignment provisions relating to the validity of the policy, but there was an endorsement page titled "Notification of Change in Ownership Endorsement." The endorsement stated that the "experience rating modification factor" may change if there

was a change in ownership, defined as "sales, purchases, other transfers, mergers, consolidations, dissolutions, formations of a new entity and other changes provided for in the applicable experience rating plan manual." The endorsement further required Fox Midwest to notify Fremont within 90 days of any such change or else Fremont could revise the experience rating modification factor. It is unclear, however, if this endorsement was in effect, as it was never signed, did not contain an effective date, and did not have an endorsement number— three things that other endorsements in the Fremont policy had. The Fremont policy required Fox Midwest to make a deposit premium and monthly installment payments.

¶ 23    Additionally, during discovery, several depositions were held, including Witte's, who testified that he began working for Fox Midwest in May 1999. He stated that, when he was injured on the job in January 2000 and over the next few months, his understanding was that he was still employed by Fox Midwest. During his deposition, Witte identified several weekly pay stubs he received from Fox Midwest. Some of these pay stubs were for pay periods ending before January 2000, and these stated that "Fox Midwest Transport, Inc.," was his employer. Additional pay stubs were for pay periods after January 2000, including up until the pay period ending on September 3, 2000. All of the pay stubs after January 2000 that Witte identified stated that "Fox Midwest Transport, Inc.," was his employer. Witte also identified W-2 tax forms for the 1999 and 2000 tax years, and each W-2 stated his employer was "Fox Midwest Transport, Inc."

¶ 24    Kostelac, the vice president of risk management for Transit Group, Inc., around 1999-2000, also gave a deposition. He testified that, during the period of time in which his company was acquiring various trucking entities, it would "try to avoid paying for the same policy period" or duplicating workers' compensation insurance coverage. To this end, Kostelac stated that, when Transit Group, Inc., acquired a new entity, it did not intend for the acquisition date to be the "absolute beginning of that [workers' compensation] insurance coverage" for the acquisition. During his deposition, Kostelac identified a spreadsheet he had created containing the various companies Transit Group, Inc., had acquired during the late 1990s, which included the effective dates of the workers' compensation insurance for them under the Ace policy. According to Kostelac, the purpose of the spreadsheet was "to determine if [a] claim should fall under [the] existing corporate program or the entity that we acquired and their existing coverage at that time." Kostelac remarked that, based on the spreadsheet, the effective date of Fox Midwest's inclusion in the Ace policy was March 1, 2000, "which was insured on a ground-up basis with Ace."

¶ 25    Although Kostelac could not recall specifics of Fox Midwest's addition into the Ace policy beyond the documentary evidence, he stated:

> "If we had a situation—and I'm not saying this was the case in Fox Midwest, but it might have been—if we had a situation where we acquired a company and within a relatively short time the policy was expiring anyway, why not just let it run its term and be done with it. The premiums have already been paid and so on. So I suspect that's what we did with Fox Midwest. I don't know that, but it kind of seems like that's what we did."

Kostelac agreed that once the merger with Fox Midwest occurred, Fox Midwest legally ceased to exist, but he did not know whether Fox Midwest's employees became employees of Transit Group, Inc. Kostelac did know that Fox Midwest's employees continued to be paid by Fox Midwest out of its Green Bay, Wisconsin, office. But he noted that Fox Midwest was subject

to the management and mandates of Transit Group, Inc. Kostelac also acknowledged that, in December 2001, Transit Group, Inc., filed for bankruptcy "immediately in the face of [its] insurance renewal" for the subsequent year.

¶ 26    Fred Angley, an account executive with Energy Insurance Brokers in 1999 and 2000, was also deposed. Angley testified that he had a close relationship with Cigna Insurance, which later became Ace and frequently provided clients with Ace insurance policies. Angley's relationship with Transit Group, Inc., was through a relationship with Duane Williams, a retail insurance broker of Neace Lukens, who helped Transit Group, Inc., obtain insurance for its trucking business. When Transit Group, Inc., would acquire a new trucking business and when directed by Williams or Kostelac, Angley would add the acquisition as an additional insured to the already-in-effect workers' compensation policy. However, Angley stated that this would not necessarily occur on the same date the acquisition occurred. When asked to recall why Fox Midwest was not immediately added to the Ace policy, Angley could not remember exactly why but speculated that it could have been because Fox Midwest was covered by the existing Fremont policy. Angley opined that an entity acquired by Transit Group, Inc., would not be covered by its existing workers' compensation policy unless the policy was specifically endorsed to cover that new entity. Angley explained that, if a new acquisition was automatically covered by a policy, the insurance provider would be disadvantaged by having liability exposure to an entity it knew nothing about and it would not have received a premium payment to cover the additional risk. However, Angley acknowledged that there were occasions when two policies could overlap with one another and an insured would have two policies covering the same risk.

¶ 27    During the deposition, Angley identified a fax sent to him on February 18, 2000, by Kostelac, providing payroll data for the 1999 year for several entities under the Transit Group, Inc., umbrella. According to the fax, Kostelac stated "[o]f course Network, KAT, *Fox*, Priority, R&M and Rainbow did not participate in the Transit Group corporate program." (Emphasis added.) Angley remarked that he used payroll data to help calculate estimates of insurance renewals. Based on the documentation he reviewed, he agreed that he did not add Fox Midwest to the Ace policy before March 1, 2000.

¶ 28    Additionally, Duane Williams was deposed. He testified that he helped provide trucking companies with various forms of insurance, including workers' compensation insurance. He recalled working with Transit Group, Inc., on its workers' compensation insurance and noted when a new entity needed to be added to its policy, Kostelac would inform him. Williams would compile various data on the new entity, including loss information and payroll information, and provide the data to wholesale insurance brokers, such as Angley. According to Williams, this process would occur months before Transit Group, Inc., actually acquired the new entity, and he believed that the Fox Midwest acquisition followed this process. Williams asserted that, when Transit Group, Inc., would acquire a new entity that had an existing workers' compensation policy in effect, he would delay having the new entity added to the policy of Transit Group, Inc., in order to avoid duplicate coverage. During his deposition, Williams identified a fax he sent to Angley on February 22, 2000, providing Angley with information on a quote from Virginia Surety Company, Inc., for workers' compensation coverage to Fox Midwest. Williams remarked that he sent this fax likely to get a comparable quote on workers' compensation insurance from Angley for Fox Midwest.

¶ 29    In the deposition of Peter May, a senior underwriter for Ace, he testified that he could not recall specifically working on the policy of Transit Group, Inc., but had no reason to doubt that he did based on an assertion from Angley. After reviewing the policy document covering Transit Group, Inc., May noted that there were handwritten names on an "Other Insureds Extension" page, which he thought was sloppy and indicative of the policy document he reviewed not being the final policy document. May agreed that, based on the document he reviewed, the policy provided workers' compensation coverage to all Transit Group, Inc., employees "unless they [were] otherwise excepted in [the] policy." May asserted that, in the normal course of workers' compensation policies, if Transit Group, Inc., hired a new employee, that employee "would be automatically covered" under the policy. However, May also stated that, "[i]f someone is—a new entity is added, new subdivision—say there's another purchase for Transit Group—that employee from that new subdivision or company would be added to the policy, that's correct—part of the policy." According to May, generally in order to add an entity to a policy during the middle of a policy period, it "wouldn't be automatic" and his company would "have to know [be]cause we might not want to add it." May agreed that, if there was an existing policy covering an entity, such as Fox Midwest, at the time of an acquisition, the acquiring entity would not want to add the entity to its existing policy because it would not want double coverage.

¶ 30    According to May, given the possibility of employment fluctuations during a policy period, insurance companies generally required an initial premium, which would be calculated based on various data about the employer, and then the insurance company would audit the final employment numbers after the policy period and adjust the premium based on that information, returning any surplus premium or requiring an additional premium. Lastly, during May's deposition, he identified an e-mail sent on July 19, 2001, from Mark Cropanese to Pete Wagner, informing Wagner that "to the best of [Cropanese's] knowledge, Fox Midwest was to be added to Transit Group's WC policies effective [March 1, 2000]." According to May's recollection, Cropanese worked for Ace, and Wagner was an audit coordinator.

¶ 31                                   D. Motion to Dismiss

¶ 32    In January 2018, the Transit Group entities and Ace filed a joint motion to dismiss the Fund's amended complaint pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2000)). They observed that the Fund's amended complaint sought a determination of liability for Witte's workers' compensation benefits but argued the issue of coverage did not become relevant until it was determined who among the various entities employed Witte at the time of his accident, a question of fact that had to be determined by the Commission. The Fund responded that the issue raised by its amended complaint was not who among the various entities employed Witte at the time of his accident, but rather whether Fox Midwest was even in existence at that time due to it being merged into TGT Merger. The Fund posited that this was a legal question for the circuit court to resolve.

        In June 2018, the circuit court denied the motion to dismiss, finding that it had subject matter jurisdiction in the litigation. The court noted that Witte had already been granted workers' compensation benefits based in part on a finding that he was employed for purposes of the Act (820 ILCS 305/1 *et seq.* (West 2000)). As such, the court determined that the Fund's lawsuit presented collateral questions of law, which involved the construction of the merger

agreement and an insurance policy, both appropriate for the court to resolve.

¶ 33                                    E. Motions for Summary Judgment

¶ 34         Also in January 2018, Ace, the Transit Group entities, and the Fund all filed cross-motions for summary judgment. Ace filed a motion for summary judgment on count II, arguing that the uncontested evidence showed that Fox Midwest was not covered by the Ace policy on January 17, 2000, when Witte had his workplace accident. Ace highlighted multiple exhibits produced during the depositions, including (1) the spreadsheet Kostelac created, which showed the effective date for covering Fox Midwest on the Ace policy of March 1, 2000; (2) the fax Kostelac sent to Angley on February 18, 2000, wherein Kostelac stated "[o]f course *** Fox *** did not participate in the Transit Group corporate program"; and (3) the Ace policy that showed various trucking entities acquired by Transit Group, Inc., as other named insureds, but not Fox Midwest. Ace further pointed to the deposition testimony of Kostelac, Williams, Angley, and May, in which they all indicated that Fox Midwest was added to the Ace policy on March 1, 2000, the same date that the Fremont policy ended, to avoid duplicate insurance coverage. Ace asserted that there was no genuine issue of material fact that Witte was an employee of Fox Midwest on January 17, 2000, and the Fremont policy covered him on that date. Ace contended that, because there was no evidence Fox Midwest was added to its policy prior to March 1, 2000, and no evidence that any premium was collected to cover Fox Midwest, it was entitled to summary judgment.

¶ 35         In the Transit Group entities' motion, they argued that they were entitled to summary judgment on count I because Witte was indisputably an employee of Fox Midwest on January 17, 2000, and covered by the Fremont policy issued to Fox Midwest. The Transit Group entities highlighted Witte's deposition testimony, wherein he testified that he was employed by Fox Midwest at the time of his accident, and also highlighted his pay stubs and tax forms showing that Fox Midwest was Witte's employer at the time of his accident and well after the accident. The Transit Group entities noted the amended complaint's allegation that Witte was an employee of TGT Merger at the time of his workplace accident but asserted that there was no evidence to support any contract for hire between Witte and TGT Merger. They also argued that they were entitled to summary judgment on count II, making the same arguments made by Ace in its motion for summary judgment on count II.

¶ 36         In the Fund's motion, it contended it was entitled to summary judgment on both counts of its amended complaint, arguing that once Fox Midwest merged into TGT Merger, Fox Midwest became a part of the Transit Group enterprise. According to the Fund, following the merger, Fox Midwest ceased to exist and was legally a part of the Transit Group enterprise. Although the Fund acknowledged the Fremont policy, it asserted that, because the named insured under that policy was Fox Midwest and Fox Midwest no longer legally existed, the policy did not cover Witte's workplace accident. Rather, the Fund asserted that, because Witte was an employee of the Transit Group enterprise, which had the Ace policy in effect, the Ace policy covered Witte's accident. The Fund therefore argued that the circuit court should declare the Ace policy primarily responsible for Witte's workers' compensation benefits. Alternatively, the Fund argued that both the Ace policy and the Fremont policy covered Witte's accident, and under the doctrine of equitable contribution, the policies were concurrent and insured the same risks. The Fund therefore argued in the alternative that the circuit court should declare both

Fremont and Ace were responsible for Witte's workers' compensation benefits and declare the payments to be equally divided.

¶ 37 Following briefing on the summary judgment motions, the circuit court held a hearing. Although the record on appeal does not include a report of proceeding of the hearing, the circuit court's order disposing of the cross-motions for summary judgment indicated that the court "generally inquired" about the relationships between the Transit Group entities at the time of Witte's accident. According to the order, the Fund "asserted that all of the relevant entities had merged into Transit Group, Inc. as of January 17, 2000" and neither the Transit Group entities nor Ace "objected to nor attempted to clarify the contention and the court takes it as true." With this assertion taken as true and in light of the evidence supporting the cross-motions for summary judgment, the court granted the Fund's motion for summary judgment. The court determined that, on the date of Witte's injury, Fox Midwest "no longer existed" as it had "been entirely subsumed into the Transit Group, Inc.," which inherited "all rights, responsibilities, and liabilities of Fox Midwest," including the employment of Witte. As such, the court found Witte employed by Transit Group, Inc., as a matter of law on the date of his accident. Furthermore, the court observed that Transit Group, Inc., was the named insured on the Ace policy and, thus, declared that the Ace policy covered Witte's workplace accident. Given these findings, the court also denied the motions for summary judgment of Ace and the Transit Group entities.

¶ 38 The Transit Group entities and Ace subsequently appealed the circuit court's rulings on their joint motion to dismiss as well as the cross-motions for summary judgment.

¶ 39                                   II. ANALYSIS
¶ 40                               A. Motion to Dismiss

¶ 41 The Transit Group entities and Ace first contend that the circuit court erred when it denied their joint motion to dismiss where the question of what entity employed Witte at the time of his accident was a factual one that should have been decided by the Commission.

¶ 42 A motion to dismiss brought under section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2000)) admits the legal sufficiency of the plaintiff's complaint but asserts that an affirmative matter defeats the claim. *Smith v. Vanguard Group, Inc.*, 2019 IL 123264, ¶ 9. One such affirmative matter is that the circuit court does not have subject matter jurisdiction of the case. 735 ILCS 5/2-619(a)(1) (West 2000); *People ex rel. Madigan v. Burge*, 2014 IL 115635, ¶ 18. We review a section 2-619 motion to dismiss *de novo*. *Smith*, 2019 IL 123264, ¶ 9.

¶ 43 The Transit Group entities and Ace base their subject matter jurisdiction argument in part on section 18 of the Act, which states that "[a]ll questions arising under this Act, if not settled by agreement of the parties interested therein, shall, except as otherwise provided, be determined by the Commission." 820 ILCS 305/18 (West 2000). Despite this provision of the Act, the circuit court may still have jurisdiction to resolve certain workers' compensation matters. In *Employers Mutual Cos. v. Skilling*, 163 Ill. 2d 284, 287 (1994), our supreme court determined that section 18 of the Act was insufficient to divest the circuit court of jurisdiction over all issues involving workers' compensation. Because of this, a court must determine whether an issue involving workers' compensation is reserved exclusively for the Commission or whether the circuit court and the Commission hold concurrent jurisdiction over the issue. *Id.* at 286. And, if concurrent, a court must decide which forum has paramount jurisdiction. *Id.*

- 10 -

¶ 44    While generally, Illinois courts have original jurisdiction over all justiciable matters (Ill. Const. 1970, art. VI, § 9), the legislature may vest exclusive original jurisdiction in an administrative agency "when it has explicitly enacted a comprehensive statutory administrative scheme." *Hastings Mutual Insurance Co. v. Ultimate Backyard, LLC*, 2012 IL App (1st) 101751, ¶ 31. As a result, because of the Act, the circuit court has "no original jurisdiction over workers' compensation proceedings, wherein benefits are determined, under the Act." *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 158 (1992); see also *Bradley v. City of Marion, Illinois*, 2015 IL App (5th) 140267, ¶ 25 (where the issue concerned the plaintiff's entitlement to workers' compensation benefits and the defendants' defenses to the plaintiff's claim, those issues fell "squarely within the purview of the Commission's exclusive jurisdiction"). And in these situations, a party must pursue and exhaust all administrative remedies before looking for review in the courts. *Skilling*, 163 Ill. 2d at 288.

¶ 45    In this case, the Fund's declaratory judgment action does not involve an issue about whether Witte is entitled to workers' compensation benefits. Importantly, it has already been adjudicated that Witte was entitled to such benefits and he has received those benefits. The primary issue here concerns the legal effect of Fox Midwest's merger into TGT Merger as it relates to workers' compensation insurance policies, which broadly may be deemed questions of corporate and contract law. See *Continental Western Insurance Co. v. Knox County EMS, Inc.*, 2016 IL App (1st) 143083, ¶¶ 21, 29 (where question in litigation concerned "how the financial burden to pay [a claimant's] workers' compensation award, if any, will be distributed," the dispute was one "of contract interpretation" and not within the exclusive jurisdiction of the Commission). Thus, the Commission does not have exclusive jurisdiction over this dispute.

¶ 46    Where the Commission does not have exclusive jurisdiction over an issue related to workers' compensation, the Commission and the circuit court hold concurrent jurisdiction. *Skilling*, 163 Ill. 2d at 287. In these instances, we must examine the relationship between the circuit court and the administrative agency relative to the issue involved. See *id.* at 288. That is to say, even if the circuit court has jurisdiction to hear a matter, the administrative agency may be a better forum to resolve the matter given its specialized and technical expertise. *Id.* at 288-89. In such cases, primary jurisdiction would lie with the administrative agency such that the circuit court should "stay the judicial proceedings pending referral of a controversy, or some portion of it, to an administrative agency having expertise in the area." *Id.* at 288.

¶ 47    Under these principles, this is not a case where the primary jurisdiction lies with the Commission. The critical issue before us—the legal effect of Fox Midwest's merger into TGT Merger as it relates to workers' compensation insurance policies—presents questions of corporate and contract law. While workers' compensation law is tangentially related to the issue at hand, this case does not require a detailed examination of the Act or any other matter where specialized and technical expertise in workers' compensation law is required. As such, given the questions of corporate and contract law involved, this declaratory judgment action was properly resolved by the circuit court. See *id.* at 289.

¶ 48    In reaching this conclusion, we find the Transit Group entities and Ace's reliance on *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456 (2010), unpersuasive. In *Keating*, the plaintiff fell and injured himself while working on a porch of an apartment building. *Id.* at 458. He sued the owner of the building and the property management company for negligence in a premises liability action. In his fourth amended complaint, he alleged that the defendants were

- 11 -

employers for purposes of the Act and, thus, had an obligation to provide him with workers' compensation insurance. *Id.* at 458, 462. Ultimately, in granting the defendants' motion to strike the plaintiff's allegation of employment, the circuit court determined that the Commission had exclusive jurisdiction to decide if the defendants were employers for purposes of the Act. *Id.* at 462.

¶ 49 On appeal, the appellate court agreed, finding that the Commission, due to its expertise, was "uniquely suited" to make the factual determinations of "whether an employment relationship existed." *Id.* at 468. As such, this court held that the Commission, not the circuit court, was the proper forum for the plaintiff to seek relief based on an alleged employment relationship. *Id.* at 470.

¶ 50 In the present case, the determination of whether Witte was employed for purposes of the Act—a question that the Commission is uniquely suited to resolve—has already been made by the Commission in Witte's earlier workers' compensation case. The issue here concerns the legal effect of Fox Midwest's merger into TGT Merger as it relates to workers' compensation insurance policies—questions of corporate and contract law that the Commission is not uniquely suited to resolve. Accordingly, the circuit court properly denied the Transit Group entities and Ace's joint motion to dismiss.

¶ 51                              B. Cross-Motions for Summary Judgment

¶ 52 The Transit Group entities and Ace next contend that the circuit court erred in denying their motions for summary judgment and in granting the Fund's motion for summary judgment. They posit that the undisputed facts show that, when Witte had his workplace accident, Fox Midwest had not been added to the Ace policy because Fox Midwest had its own policy at the time through Fremont. They therefore argue that the Fremont policy was the only workers' compensation insurance policy covering Witte's injury. Additionally, the Transit Group entities and Ace assert that there was no evidence that Ace received a premium payment in exchange for covering Fox Midwest on the Ace policy, further demonstrating that the Ace policy could not have covered Witte's workplace accident.

¶ 53 By the parties' filing of cross-motions for summary judgment, they have agreed that there is only a question of law involved and therefore invite the circuit court to resolve the litigation based solely upon the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. Disposing of litigation on a motion for "[s]ummary judgment is a drastic" measure, and such a motion "should be granted only when the movant's right to judgment is clear and free from doubt." *Bremer v. City of Rockford*, 2016 IL 119889, ¶ 45. Specifically, the circuit court should only grant summary judgment where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, demonstrate that there is no genuine issue of any material fact, and the moving party is entitled to judgment as a matter of law. *Gurba v. Community High School District No. 155*, 2015 IL 118332, ¶ 10. A genuine issue of material fact exists where the material facts are disputed or reasonable people could draw different inferences from the undisputed facts. *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. We review the circuit court's ruling on a motion for summary judgment *de novo*. *Gurba*, 2015 IL 118332, ¶ 10. Furthermore, when we construe provisions of an insurance policy, this involves a question of law, which we also review *de novo*. *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 455 (2010).

¶ 54 In this case, there are several undisputed facts, beginning with the fact that Witte commenced his employment with Fox Midwest in May 1999. At this time, Fox Midwest had a workers' compensation policy through Fremont, covering it from March 1, 1999, until March 1, 2000. In late December 1999, Transit Group, Inc., used TGT Merger, its subsidiary, to effectuate a merger with Fox Midwest. According to the merger documents, Fox Midwest merged into TGT Merger, and TGT Merger was the surviving corporate entity. In the deposition of Kostelac, he explained that Transit Group, Inc., used subsidiaries to perform acquisitions via merger, and then "very rapidly" rolled the acquisitions into Transit Group, Inc. A little more than two weeks after the merger, Witte had his workplace accident. At the time of his accident, Transit Group, Inc., had a workers' compensation policy through Ace, covering it from January 1, 2000, until January 1, 2001. Witte then filed a claim for workers' compensation and began receiving benefits from Fremont until July 2, 2003, when it was involuntarily liquidated by the State of Illinois. At this time, the Fund took over as the provider of benefits to Witte.

¶ 55 At the outset, before addressing the legal consequences of these undisputed facts, we note that the effect of a merger is a matter of corporate law, and the parties have not raised any choice-of-law issue, on appeal or in the circuit court. While it is clear that, because Witte's accident occurred in Illinois, the Act applied to his workers' compensation claim and subsequent benefits (see 820 ILCS 305/1(b)(2) (West 2000)), the same cannot be said conclusively for the effect of the merger. The merger at issue in this case was between a Wisconsin corporation (Fox Midwest) and a Delaware corporation (TGT Merger), in which only a Delaware corporation survived, in accordance with those states' business statutes based on the merger documents. But there is no meaningful difference among Illinois, Delaware, or Wisconsin law concerning the effect of a statutory merger (see 805 ILCS 5/11.50 (West 2000); Del. Code Ann. tit. 8, § 259(a) (2000); Wis. Stat. § 180.1106 (1999)), such that there is no real choice-of-law issue. See *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 155 (2007) ("A choice-of-law determination is required only when a difference in law will make a difference in the outcome."). As such, we will apply Illinois law.

¶ 56 Under Illinois law, when two corporations merge, the result is a single corporation, the one designated by the merger documents as the surviving corporation. 805 ILCS 5/11.50(a)(1) (West 2000). The since-merged corporation no longer exists legally. *Id.* § 11.50(a)(2). Thus, upon the merger, the surviving corporation possesses

> "all property, real, personal, and mixed, and all debts due on whatever account, including subscriptions to shares, and all other choses in action, and all and every other interest, of or belonging to or due to each of the corporations so merged or consolidated, shall be taken and deemed to be transferred to and vested in such single corporation without further act or deed." *Id.* § 11.50(a)(4).

Additionally, the surviving corporation "shall thenceforth be responsible and liable for all the liabilities and obligations of each of the corporations so merged." *Id.* § 11.50(a)(5). Delaware and Wisconsin law provide for the same transfer of assets, rights, liabilities and obligations by operation of law to the surviving corporation following a merger, and they similarly provide that the since-merged corporation no longer exists legally. See Del. Code Ann. tit. 8, § 259(a) (2000); Wis. Stat. § 180.1106 (1999).

¶ 57 Because the merger at issue in this case was a statutory one, on January 1, 2000, after Fox Midwest merged into TGT Merger, Fox Midwest no longer legally existed. See 805 ILCS

- 13 -

5/11.50(a)(2) (West 2000) ("The separate existence of all corporations parties to the plan of merger or consolidation, except the surviving or new corporation, shall cease."); see also Del. Code Ann. tit. 8, § 259(a) (2000) ("When any merger *** shall have become effective under this chapter, for all purposes of the laws of this State the separate existence of all the constituent corporations, or of all such constituent corporations except the one into which the other or others of such constituent corporations have been merged, as the case may be, shall cease ***."); Wis. Stat. § 180.1106(1)(a) (1999) ("Every other corporation that is party to the merger merges into the surviving corporation and the separate existence of every corporation party to the merger except the surviving corporation ceases."). And once Fox Midwest ceased to exist, Witte was no longer an employee of Fox Midwest, but rather became an employee of TGT Merger by operation of law.

¶ 58    However, according to Kostelac's deposition, TGT Merger was merely used as a "legal vessel[ ]" used for tax purposes to effectuate the acquisition of Fox Midwest by Transit Group, Inc. Thus, as Kostelac remarked during his deposition, Fox Midwest and TGT Merger were rolled into Transit Group, Inc., "very rapidly" following the merger. And during the hearing on the parties' cross-motions for summary judgment, according to the circuit court's written order disposing of the motions, the Fund "asserted that all of the relevant entities, including TGT Merger, had merged into Transit Group, Inc. as of January 17, 2000. Defendants neither objected to nor attempted to clarify the contention and the court takes it as true." Thus, it is clear that, as of January 17, 2000, TGT Merger itself had ceased to be a subsidiary of Transit Group, Inc., but rather was also merged into Transit Group, Inc., meaning Witte was employed by Transit Group, Inc., when he was injured on the job. While Witte may have been in the "Fox Midwest division" or some nomenclature to that effect within Transit Group, Inc., he could not work for "Fox Midwest Transport, Inc.," as no such corporation existed following its merger into TGT Merger. Though Witte received pay stubs and a W-2 form from "Fox Midwest Transport, Inc.," following the merger, these documents cannot override the legal effect of Fox Midwest being merged into TGT Merger and later into Transit Group, Inc.—its cessation of existence as a corporation. See 805 ILCS 5/11.50(a)(2) (West 2000).

¶ 59    Given that Witte was employed by Transit Group, Inc., on January 17, 2000, we now look at the Ace policy, using the same principles to interpret and construe it as any other contract. *Saathoff v. Country Mutual Insurance Co.*, 379 Ill. App. 3d 398, 402 (2008). "When construing the language of an insurance policy, our primary objective is to ascertain and give effect to the intentions of the parties as expressed in their agreement." *Johnson v. State Farm Mutual Automobile Insurance Co.*, 323 Ill. App. 3d 376, 381 (2001). But if the terms of the policy are clear, they will be applied as written and given their plain and ordinary meaning. *Id.*

¶ 60    The Ace policy stated that the named insured was "Transit Group, Inc.," and the policy covered "TRUCKING IL" as a workplace. And Witte, as discussed, became an employee of Transit Group, Inc., by January 17, 2000. Given this, the Ace policy covered Witte as an employee of Transit Group, Inc., when he injured himself on the job. We recognize that, in the Ace policy, there were multiple "Other Insureds Extension" pages listing several other entities, including those that Transit Group, Inc., had acquired during the late 1990s. Fox Midwest's name was not one of them. But as discussed, the Ace policy clearly covered Transit Group, Inc., employees, which Witte was when he had his workplace accident.

¶ 61    Under section 546(a) of the Illinois Insurance Code (215 ILCS 5/546(a) (West 2000)):

- 14 -

"[a]n insured or claimant shall be required first to exhaust all coverage provided by any other insurance policy, regardless of whether or not such other insurance policy was written by a member company, if the claim under such other policy arises from the same facts, injury, or loss that gave rise to the covered claim against the Fund."

The General Assembly added to this section in 2015 that when an insured or claimant does not first exhaust coverage, the Fund has "an independent right of recovery against each insurer whose coverage was not exhausted in the amount the Fund would not have had to pay if that insurer's coverage had been exhausted first." 215 ILCS 5/546(a) (West 2016). Because we have found that the Transit Group, Inc., policy issued by Ace covered Witte at the time of his accident, the Ace policy was "other insurance" that should have been exhausted prior to the Fund paying Witte workers' compensation benefits.

¶ 62    Nevertheless, the Transit Group entities and Ace raise multiple arguments as to why the Ace policy was not other insurance. First, they posit that there was no evidence that any premium was collected by Ace to cover Fox Midwest on the date of Witte's accident. However, this argument ignores that Fox Midwest did not exist at the time of Witte's accident and the deposition testimony of May, who testified that, if Transit Group, Inc., hired a new employee, that employee "would be automatically covered" under the Ace policy. Witte was an employee of Transit Group, Inc., at the time of his accident and was automatically a part of the Ace policy. We do agree with the Transit Group entities and Ace that a premium is an indispensable part of an insurance policy and the amount of a premium is commensurate with the amount of risk the insurer undertakes to cover the insured. See generally *Illinois Insurance Guaranty Fund v. Virginia Surety Co.*, 2012 IL App (1st) 113758, ¶ 15; *Ryan v. State Farm Mutual Automobile Insurance, Co.*, 397 Ill. App. 3d 48, 51-52 (2009). But as noted by May in his deposition, the possibility of employment fluctuations of a named insured is contemplated by the insurer ahead of time, and the reason an insurer generally requires an initial premium and an audit following the policy period is to return any premium surplus or require an additional premium.

¶ 63    Additionally, citing *Board of Education of the City of Chicago v. Industrial Comm'n*, 53 Ill. 2d 167 (1972), *Crepps v. Industrial Comm'n*, 402 Ill. 606 (1949), and *Wolverine Insurance Co. v. Jockish*, 83 Ill. App. 3d 411 (1980), the Transit Group entities and Ace argue that, under the Act, the relationship of an employer and employee is a product of mutual assent. They posit that there was no proof of employment of Witte by any of the Transit Group entities, including TGT Merger. And they assert that, based on Witte's deposition testimony, he was unaware that he was employed by anyone other than Fox Midwest at the time of his accident.

¶ 64    In all three decisions cited by the Transit Group entities and Ace, the question presented was whether a person was employed for purposes of the Act, and evidence of mutual assent was relevant to that inquiry. See *Board of Education*, 53 Ill. 2d at 170 (determining whether a college student volunteering at a Chicago public school was employed by the Board of Education of the City of Chicago when she injured herself at the school); *Crepps*, 402 Ill. at 610-16 (determining whether an electrician installing light fixtures at the office of a real estate broker was his employee when he injured himself at the office); *Jockish*, 83 Ill. App. 3d at 416 (determining whether a truck driver helping a friend retrieve a disabled truck off the highway was an employee of the friend when he injured himself on highway). In this case, however, it is undisputed that Witte was employed at the time of his accident for purposes of the Act. One of the critical questions here is who that employer was, a legal question resolved by virtue of

Fox Midwest and TGT Merger executing a statutory merger, wherein the assets and property of Fox Midwest vested in TGT Merger by operation of law. See 805 ILCS 5/11.50(a)(4) (West 2000). Because the statutory merger transferred Witte's employment by operation of law, no extrinsic proof of employment by the Transit Group entities was required, and a question of mutual assent was simply not presented in this case. Thus, *Board of Education*, *Crepps*, and *Jockish* are inapposite. Furthermore, Witte's subjective belief of who his employer was on the date of his injury is meaningless. Again, while Witte may have been part of the "Fox Midwest division" of Transit Group, Inc., he was legally employed by Transit Group, Inc.

¶ 65 The Transit Group entities and Ace further argue there was no evidence that the Fremont policy had been cancelled with that cancellation accepted by the Commission pursuant to the Illinois workers' compensation insurance regulations. See 50 Ill. Adm. Code 9100.30 (1986). Although we have concluded that the Ace policy covered Witte's accident, that does not mean we have also concluded that the Fremont policy *did not* cover Witte's accident, as there is nothing that would preclude two workers' compensation policies from insuring the same risk. See *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 316 (2004) (finding the doctrine of equitable contribution applicable in circumstances where there are "concurrent policies insur[ing] the same entities, the same interests, and the same risks"). According to various deposition testimony, duplicate coverage is not the preferred practice, and businesses attempt to avoid such instances, but it can and does happen. As such, it is quite possible that, due to Fox Midwest's statutory merger into TGT Merger, the Fremont policy transferred to TGT Merger as an asset and interest of Fox Midwest prior to the merger. See 805 ILCS 5/11.50(a)(4) (West 2000); see also *Elliott Co. v. Liberty Mutual Insurance Co.*, 434 F. Supp. 2d 483, 492 (N.D. Ohio 2006) (finding that "[c]ourts have transferred [insurance] coverage by operation of law in a number of situations" and "[t]he most common situation occurs during a corporate merger"); *Knoll Pharmaceutical Co. v. Automobile Insurance Co. of Hartford*, 167 F. Supp. 2d 1004, 1010-11 (N.D. Ill. 2001) (interpreting Illinois law and finding that, upon a statutory merger, insurance rights of since-merged corporation transferred to the surviving corporation by operation of law).

¶ 66 However, as previously noted, Fremont was involuntarily liquidated by the State of Illinois on July 2, 2003, at which point the Fund took over as the provider of benefits to Witte. It is from this point on that the Fund seeks a declaration that it was not responsible for Witte's workers' compensation benefits and ultimately compensation from that declaration. In other words, whether Fremont properly paid out benefits to Witte prior to July 2, 2003, is not at issue in this appeal. Our only concern is whether the Fund became responsible following Fremont's involuntary liquidation. And in light of our finding that Witte was legally an employee of Transit Group, Inc., on the date of his accident, and the Ace policy's named insured was Transit Group, Inc., the circuit court properly declared that the Ace policy covered Witte at the time of his injury. Accordingly, the court did not err in granting the Fund's motion for summary judgment and denying the Transit Group entities and Ace's motions for summary judgment.

¶ 67                                    III. CONCLUSION
¶ 68 For the foregoing reasons, we affirm the judgments of the circuit court of Cook County.

¶ 69 Affirmed.