2023 IL App (1st) 220785

No. 1-22-0785

Filed October 5, 2023

Fourth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| FRANK R. DIFRANCO, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| PATRICIA M. FALLON, THE ILLINOIS STATE | ) | No. 20 COEL 032 |
| BOARD OF ELECTIONS, and | ) | |
| KAREN A. YARBROUGH, Cook County Clerk, | ) | |
| | ) | |
| Respondents | ) | |
| | ) | Honorable |
| (Patricia M. Fallon and Karen A. Yarbrough, | ) | Patrick T. Stanton, |
| Cook County Clerk, Respondents-Appellees). | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court, with opinion.
Presiding Justice Rochford and Justice Hoffman concurred in the judgment and opinion.

**OPINION**

¶ 1        Frank DiFranco appeals the circuit court's orders granting the respondents' motion for summary judgment and denying his motion for leave to file an amended petition in his election contest.

¶ 2                                    I. BACKGROUND

¶ 3         Following the November 3, 2020, general election, the Illinois State Board of Elections (ISBE) certified Patricia Fallon as elected to the Office of Circuit Court Judge for the 12th Judicial Subcircuit of Cook County to fill the vacancy created by the retirement of Judge Kay Hanlon. It was a close election. In the final canvass, Fallon received 82,976 votes and DiFranco, 82,474—a margin of 502 votes. In percentage terms, Fallon received 50.15% and DiFranco 49.85% of the vote.

¶ 4         ISBE certified Fallon as elected on December 4, 2020. She took the oath and assumed office on December 7, 2020, and continues to serve as an elected Cook County Circuit Court judge.

¶ 5         Having received votes within 5% of Fallon's total, DiFranco petitioned for a discovery recount in 52 precincts—approximately one-fourth of the subcircuit—under section 22-9.1 of the Election Code (10 ILCS 5/22-9.1 (West 2018)).[1] The discovery recount was conducted on December 22 and 23, 2020. Thereafter, DiFranco filed the present election contest on December 31, 2020, naming Fallon, ISBE, and Karen Yarbrough, the Cook County Clerk (Clerk), as respondents. The Clerk was the local election authority responsible for administering elections in suburban Cook County, including the 12th Judicial Subcircuit.

¶ 6         DiFranco's verified petition alleged "significant mistakes and fraud [were] committed in the casting and counting of ballots" and "had the legal votes been properly counted," he would have been elected Judge of the 12th subcircuit. DiFranco made no specific allegations of fraud. Instead, the specific allegations in his petition amounted to four claims: (1) ballots were counted past the statutory time limit, (2) the number of vote-by-mail (VBM) ballots counted exceeded the

_____

[1]Such a recount is conducted for the purpose of discovery only. The results cannot be used to change the results of the previously proclaimed canvass. Nor are the results binding in an election contest. 10 ILCS 5/22-9.1 (West 2018).

number of VBM ballots requested by 18,423, (3) another 3628 VBM ballots lacking the required return envelope were improperly counted, and (4) the Clerk prevented DiFranco from fully observing the discovery recount. DiFranco requested a complete recount of all ballots cast in the 12th subcircuit for the November 3, 2020, election, an order declaring him elected, and other just relief.

¶ 7        The 2020 general election was unique. As the COVID-19 pandemic was at its height, the Illinois General Assembly enacted emergency legislation to facilitate voting by mail. See Pub. Act 101-642 (eff. Jun. 16, 2020). Many voters chose to use that method to cast their ballots—71,103 in this race. Of those, over 62% voted for Fallon, while DiFranco won a comparable percentage of the votes cast in person on or before Election Day. Hence, DiFranco's election contest focused on ballots cast by mail.

¶ 8        DiFranco's missing envelopes claim relied on results he purported from the discovery recount. His petition set forth the number of VBM ballots counted and the number of VBM return envelopes his "watchers" reported that the Clerk produced for each of the 52 precincts included in the discovery recount. According to his tallies, of the 22,461 VBM ballots counted from those precincts, 3628 were missing a return envelope, or approximately 16%. DiFranco acknowledged that the ballots were separated from the return envelopes, making it impossible to identify which ballots lacked a corresponding return envelope. For the same reason, it was impossible to determine whether improperly counted votes were cast for Fallon or DiFranco. DiFranco proposed a proportionate reduction method to ascertain the effect of improperly counted votes. That is, since Fallon received 62.85% of the total VBM votes and DiFranco received 37.15%, the candidates' vote totals should be reduced by the same percentages applied to the 3628 improperly counted votes. In other words, subtract 62.85% of those ballots (2280) from Fallon's total and 37.15% from

DiFranco's (1348). By his method, in the 52 precincts of the discovery recount alone, Fallon would lose more votes than DiFranco by a margin that overcomes Fallon's certified 502-vote win. Thus, DiFranco asserted the discovery recount revealed a reasonable probability that a recount of all the subcircuit's precincts would change the result of the election.

¶ 9    The respondents moved to dismiss DiFranco's petition. They argued that (1) the statutory two-week deadline is directory, not mandatory, and the Clerk was otherwise required to count ballots received before that date (see *Pullen v. Mulligan*, 138 Ill. 2d 21, 46 (1990) ("Failure to comply with a mandatory provision renders the affected ballots void, whereas technical violations of directory provisions do not affect the validity of the affected ballots."), (2) the more VBM ballots counted than requested claim was not set forth with sufficiently specific allegations and relied on a directory provision, (3) the statutory requirement of a return envelope is directory, and (4) alleged improprieties in the discovery recount are irrelevant to whether a recount would likely change the result of the election. In addition, the respondents objected to DiFranco's proposed method for apportioning improperly counted votes. Instead of applying the percentage of VBM votes each candidate received, the respondents argued that any apportionment should use the percentage of total votes each candidate received—50.15% and 49.85%. They contended DiFranco could not overcome his 502-vote deficit even if he could show ballots were improperly counted.

¶ 10    In response, DiFranco explained that his allegations regarding the discovery recount were provided only for background information and maintained that his other allegations were sufficient to state a cause of action. He likewise maintained that his apportionment method was appropriate.

¶ 11    The trial court dismissed the claim regarding ballots counted beyond the statutory time limit, finding that the limit was directory, not mandatory. However, the court found the statutory requirement for an application to request a VBM ballot (see 10 ILCS 5/19-2 (West 2018)) and the requirement to submit VBM ballots with the return envelope (see *id.* §§ 19-6, 19-8(g)) to be

mandatory. Accordingly, the court found DiFranco's claims of 18,423 excess ballots and 3628 ballots without envelopes were sufficient to demonstrate a reasonable likelihood that a recount would change the outcome of the election. Thus, the court denied the motion to dismiss as to those claims. The court observed that Illinois law did not provide a "bright line rule" for apportioning illegal votes. Since DiFranco's proposed method was "technically and realistically plausible," the court accepted that method in its analysis, viewing the allegations in the light most favorable to the nonmoving party. The court interpreted DiFranco's explanation that his discovery recount allegations were "background information" as a concession that this claim was not an independent basis to contest the election.

¶ 12 The respondents filed a motion for summary judgment in August 2021.[2] To refute the claim that more VBM ballots were counted than requested, the motion attached an affidavit from Edmund Michalowski, the Cook County Deputy Clerk for Elections. Michalowski attested that a voter would only receive a VBM ballot if requested and only VBM ballots returned by verified voters were counted. Regarding DiFranco's allegations of ballots counted without return envelopes, the respondents contended his claim was "factually incorrect and false." In support, the Clerk provided the court and DiFranco with hyperlinks and USB flash drives containing over 22,000 images of ballot return envelopes for the 52 precincts included in the discovery recount. The area for the voter's signature was redacted on each of the digital images. According to the respondents, this production of images demonstrated that only 117 return envelopes were missing, approximately 0.5%—far fewer than the 3628 claimed by DiFranco and too few to justify a recount since it could not alter the result.[3]

---

[2]The Clerk filed a motion for summary judgment, which Fallon joined and adopted. For simplicity, we refer to the motion as the respondents' motion.

[3]The Clerk believed the "missing" return envelopes had in fact been returned by voters, but the Clerk had not yet located the envelopes by the time of its production of the images.

¶ 13        Before responding to the motion for summary judgment, the court allowed DiFranco to depose Michalowski.[4] Michalowski testified that the Clerk reviewed applications for VBM ballots to verify the requesting voter was registered to vote. Upon verification, a VBM ballot was mailed to each voter with a return envelope. Voters could return VBM ballots by mailing their ballot through the post office or depositing their ballot in a drop box. He explained that after the Clerk received VBM ballots in envelopes, they were run through a machine that scanned the images of the envelopes and collected information. Then, the ballots were reviewed by a three-judge panel to compare signatures with voter signatures on file and otherwise verify the voter was qualified. Michalowski believed some ballots were rejected for nonmatching signatures, but he did not know how many. If not rejected, the envelopes were run through a second machine to collect information to record that the voter submitted a ballot in the election. That information would then be transmitted to the Clerk's data systems. Only after those processes were ballots separated from envelopes by hand and prepared for tabulation. Consistent with the answers to interrogatories he completed, Michalowski testified that zero VBM ballots were returned without a corresponding envelope and no such ballots were counted.

¶ 14        In December 2021, DiFranco filed both a brief opposing the motion for summary judgment and a motion for leave to file an amended petition. DiFranco asserted that "an error in the [Clerk's] redaction methodology" enabled him to review voter signatures on the ballot return envelopes. In a subsequent hearing, DiFranco's counsel explained that they found the redactions could be easily removed, making the signatures viewable. The proposed amended petition sought to add new allegations based on DiFranco's review of the envelope images. It alleged that (1) the Clerk modified the residency certification to be completed by the voter on each VBM return envelope

---

[4]DiFranco attached a transcript of Michalowski's deposition testimony to a subsequent response to the respondents' motion for summary judgment.

from the form prescribed in the Election Code, (2) 6350 ballot return envelopes had incomplete duration of residency certifications, (3) 25 ballot return envelopes had no signature, and (4) 1811 envelopes were signed by someone other than the voter or the signature was illegible.

¶ 15 In addition, DiFranco revised his claimed number of missing return envelopes from 3,628 to 455. That is, he now claimed there were only 455 fewer ballot return envelopes than VBM ballots counted. Nonetheless, the other irregularities DiFranco claimed to discover by reviewing the envelope images increased the number of ballots that he alleges should not have been counted to approximately 36% of the VBM ballots counted in the 52 precincts included in the discovery recount. Applying his proposed apportionment method to these figures, DiFranco would overcome his 502-vote deficit to Fallon by a greater margin than he claimed in his initial petition. For relief, DiFranco requested the court either order a recount and declare him elected or nullify the November 2020 election and order a special election for circuit judge for the 12th subcircuit.

¶ 16 DiFranco's brief opposing the respondents' motion for summary judgment echoed the new claims asserted in his proposed amended petition. He argued the number of additional irregularities he discovered by reviewing the envelope images demonstrated a reasonable likelihood that a recount would change the result of the election. In addition, he contended that the Clerk failed to provide an affidavit authenticating the return envelope images. To support the contention that 455 return envelopes were missing, DiFranco attached an affidavit from Rezarta Melo, a paralegal who reviewed the images produced by the Clerk. Melo counted 22,006 envelopes—455 fewer than the 22,461 VBM ballots counted. DiFranco withdrew his claim that more VBM ballots were counted than requested.

¶ 17 The respondents replied that DiFranco's removal of the redactions to view voter signatures was "offensive and sanctionable." They considered voter signatures to be personal information

that the Clerk had a duty to withhold from disclosure. Further, the respondents argued that since DiFranco alleged the signatures were viewable due to an error in the Clerk's redaction method, DiFranco understood the Clerk intended to redact the signatures and the transmission of viewable signatures was inadvertent. Thus, they claimed the Illinois Rules of Professional Conduct of 2010 obliged him to return the images and not review the signatures. See Ill. R. Prof'l Conduct (2010) R. 4.4(b) (eff. Jan. 1, 2016).

¶ 18        In addition, the respondents countered Melo's affidavit with an affidavit from Natalie Wilkins, an attorney employed by the firm representing Fallon. Wilkins asserted that Melo only counted the VBM envelope images in Portable Document Format (PDF) and failed to include 11 images from the original Agilis voting system and 259 Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) (52 U.S.C. §§ 20301-20311 (2018)) envelopes, which were produced in discovery. Including the Agilis and UOCAVA envelopes, the number of missing envelopes was 115, according to Wilkins.

¶ 19        The respondents also filed a brief opposing DiFranco's motion for leave to file an amended petition. They contended DiFranco was avoiding an impending summary judgment dismissing his petition. The amendment, they argued, abandoned his original allegations and added new claims. The respondents further argued the amendment was barred by the doctrine of *laches*[5] and DiFranco should be barred from amending his petition since his new claims were premised on his misconduct in removing the signature redactions.

---

[5]"*Laches* is an equitable defense asserted against a party who has knowingly slept upon his rights and acquiesced for a great length of time, [citation] and its existence depends on whether, under all circumstances of a particular case, a plaintiff is chargeable with want of due diligence in failing to institute proceedings before he did." (Internal quotation marks omitted.) *Tillman v. Pritzker*, 2021 IL 126387, ¶ 25.

¶ 20    DiFranco filed a surreply to the motion for summary judgment, contending that the Clerk lacked a legal basis to redact the signatures on the VBM envelopes to begin with. He further argued the signatures were a proper subject of discovery, entitling him to inspect them.

¶ 21    The court denied the respondents' motion for summary judgment on the basis that the motion lacked an affidavit to authenticate the return envelope images. The Clerk filed a motion to reconsider, along with a certification from James Nally, Legal Counsel for the Clerk, asserting that images of VBM return envelopes submitted in support of the motion for summary judgment are true and accurate copies of the envelopes the Clerk maintains as official public records. Fallon later joined the motion, and all parties agreed to treat the motion to reconsider as a renewed motion for summary judgment.

¶ 22    While the renewed motion for summary was pending, the court ruled on DiFranco's motion for leave to file an amended petition. In a written order entered February 3, 2022, the court analyzed DiFranco's motion, using the factors our supreme court set forth in *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263 (1992)—referred to as the *Loyola* factors—for determining whether leave should be granted to file an amended complaint.

¶ 23    First, the court observed that DiFranco's proposed amendment would not cure any deficiencies in his original petition but would address his original petition's "ultimate deficiency identified by the [respondents'] motion for summary judgment"—whether there were enough challenged ballots to change the outcome of the election.

¶ 24    The respondents, however, would be prejudiced by allowing the amendment, the court found. The respondents had litigated the initial claims for over a year and would have to defend new claims.

¶ 25    In addition, the court found DiFranco's request was untimely. The court observed that DiFranco reviewed the same VBM return envelopes during the discovery recount when the defects underlying his new claims were observable. So, the new claims could have been included in his initial petition. The court rejected DiFranco's contentions that the Clerk inhibited him from discovering the defects, either during the discovery recount or discovery during the pendency of his election contest.

¶ 26    DiFranco had earlier opportunities to seek to amend his petition, the court found, but failed to do so until after he filed a response to the respondents' motion for summary judgment. The court noted that delay is disfavored in an election contest and litigants are expected to act with " '[e]xtreme' " diligence in such cases, which DiFranco had failed to show. *Trump v. Biden*, 2020 WI 91, ¶ 11, 394 Wis. 2d 629, 951 N.W.2d 568 (quoting 29 C.J.S. *Elections* § 459 (Aug. 2023 Update)). Finally, upon weighing the *Loyola* factors, the court denied DiFranco's motion for leave to file an amended petition.

¶ 27    Aside from the *Loyola* factors, the court found the doctrine of *laches* barred DiFranco from amending his petition, at least for his claims regarding the Clerk's modification of the residency certification and voter failure to complete the number of years and months. The Clerk's modification was apparent before the election. Since DiFranco could have raised these issues before the election, the court reasoned, it would be unfair to invalidate votes for the thousands of voters who relied on the Clerk's preprinted certification to cast their ballots.

¶ 28    Additionally, the court found DiFranco's counsel's removal of the electronic redactions violated rules governing professional conduct and discovery. The court observed that DiFranco's attorneys knew the Clerk had intended to redact voter signatures to prevent them from being viewed. In an October 2021 status hearing, counsel for DiFranco mentioned that signatures had

been redacted and proposed conferring with the Clerk to submit an agreed protective order but failed to follow through with the suggestion. Nevertheless, the court took counsel's representation as his acknowledgement that the signatures were confidential. DiFranco never attempted to compel production of unredacted images. When DiFranco's attorneys discovered the redactions could be removed, "they knew what they were doing was contrary to what the Clerk intended when it provided the envelopes to the Court and counsel." The court reasoned that the Clerk's submission of the VBM envelope images without "foolproof" redactions was akin to an inadvertently sent document. So, upon DiFranco's attorneys' discovery that they could manipulate the redactions to view the signatures, Rule 4.4(b) of the Illinois Rules of Professional Conduct of 2010 was implicated. In the court's view, whether the signatures were required to be kept confidential was irrelevant. Instead, sanctions were appropriate if the party "acted willfully, in bad faith, and with fault in a way that abused the judicial process in collecting [the information]." *Xyngular v. Schenkel*, 890 F.3d 868, 874 (10th Cir. 2018). Since DiFranco, through his counsel, "decided for himself" to remove the redactions instead of raising the issue so the court could decide, the court determined sanctions were appropriate.

¶ 29        DiFranco filed a memorandum opposing the respondents' renewed motion for summary judgment. DiFranco attached a second affidavit from Melo to respond to Wilkins's affidavit. Melo revised her own count of missing envelopes to 439.

¶ 30        After hearing argument from the parties, the court took the motion for summary judgment under advisement. In a written order entered May 11, 2022, the court granted the respondents' motion and entered judgment in their favor. The court noted DiFranco's allegation that VBM ballots lacking a return envelope were improperly counted was the sole claim remaining. The court further noted that the relevant evidence consisted of (1) DiFranco's "watcher" affidavits, which,

taken together, attest that the Clerk produced 3628 fewer envelopes than VBM ballots counted for the precincts included in the discovery recount, (2) the over 22,000 images of return envelopes the Clerk submitted, (3) competing affidavits from Melo and Wilkins regarding the number of return envelopes the Clerk had produced in discovery, and (4) Michalowski's deposition testimony.

¶ 31    First, the court addressed DiFranco's contention that the court could not consider the images of return envelopes. The court observed the hearsay rule was not applicable since the images were offered as evidence of their existence—proof they were not missing—not for the truth of any matter asserted on the envelopes. The court found the images were admissible as authenticated public records under Illinois Rule of Evidence 901 (eff. Sept. 17, 2019). The images were authenticated by (1) Nally's affidavit stating they were true and accurate copies of the originals maintained by the Clerk, (2) Michalowski's testimony describing how return envelopes were received, scanned, and saved, and (3) characteristics apparent from the images, including the title "Official Suburban Cook County Ballot Return Envelope," bar codes, date stamps, and printed names of voters. Other than contesting whether Nally had compared the images to the originals, the court observed, DiFranco offered nothing to dispute their authenticity.

¶ 32    Next, the court observed the competing affidavits offered different figures as to how many envelopes had been produced: Watkins said all but 115; Melo said 439 were missing. Viewing the evidence in the light most favorable to the nonmoving party, the court used DiFranco's count of 439. That number equated to 1.954% of the 22,461 VBM ballots counted from the 52 precincts included in the discovery recount. Applying DiFranco's proposed method for projecting the likely results of a subcircuit-wide recount, the court calculated that a rate of 1.954% VBM ballots without an envelope leads to an expected 1398 missing envelopes for the entire subcircuit.

¶ 33        Then, the court noted that missing envelopes could not be tied to a corresponding VBM ballot. Thus, proportional allocation of disqualified VBM ballots was the only remedy. The court observed that DiFranco proposed a "novel" method for allocating disqualified votes. Instead of proportional reduction based on precinct results, DiFranco argued the voting tendency of all VBM voters was a better predictor of how a VBM ballot was cast. Applying DiFranco's method, however, the court calculated that DiFranco would only reduce the margin by 357 votes. That is, Fallon would lose 873 votes (62.85% of 1389) while DiFranco would lose 516 (37.15% of 1389).[6] Thus, even using DiFranco's novel method, he would not overcome his 502-vote deficit.

¶ 34        Finally, the court added that its analysis excluded the possibility that the Clerk might prove VBM ballots were properly counted, despite the disparity in VBM ballots and envelopes produced. In addition, Fallon would be able to contest ballots in a recount, which may counteract his net gain from disqualified ballots. Thus, viewing the evidence in the light most favorable to DiFranco, the court concluded "there do not appear to be any likely circumstances in which a recount will alter the results of this election."

¶ 35        DiFranco filed a timely notice of appeal from the trial court's orders denying his motion for leave to file an amended petition and granting the respondents' motion for summary judgment.

¶ 36                                            II. ANALYSIS

¶ 37                                            A. Jurisdiction

¶ 38        This court is obliged to consider its own jurisdiction, even when no party raises the issue. *Daewoo International v. Monteiro*, 2014 IL App (1st) 140573, ¶ 72. Likewise, we are obliged to take notice of matters that go to the jurisdiction of the circuit court in the case before us. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 334 (2002). Apart from the power

---

[6]For these calculations, the court used the number 1389 instead of 1398—flipping 8 and 9. The error made no difference to the conclusion.

to review administrative actions as conferred by statute, a circuit court's subject matter jurisdiction extends only to " 'justiciable matters.' " *Id.* (quoting Ill. Const. 1970, art. VI, § 9). "[A] 'justiciable matter' is a controversy appropriate for review by the court, in that it is definite and concrete, as opposed to hypothetical or moot, touching upon the legal relations of parties having adverse legal interests." *Id.* at 335. When a court cannot grant effectual relief to the complaining party, an action is considered moot. *In re Marriage of Eckersall*, 2015 IL 117922, ¶ 9.

¶ 39 Effectual relief does not exist when any judgment rendered would have no practical effect. 1A C.J.S. *Actions* § 75 (Sept. 2023 Update). Here, a court could determine whether DiFranco was elected, but a declaration that DiFranco was elected would not automatically put him in office. Fallon took the oath of office, assumed office, and continues to occupy the office formerly held by Hanlon. Two people cannot occupy a single judicial office, and the courts cannot create an additional judicial office. *McDunn v. Williams*, 156 Ill. 2d 288, 305-10 (1993). For DiFranco to take office, Fallon would have to be removed. Accordingly, effectual relief for DiFranco would mean both declaring him elected and removing Fallon.

¶ 40 Removal from public office requires more than a declaration that another candidate was elected to that office. The Election Code only provides for the court hearing a contest of an election for public office to declare a person elected. See 10 ILCS 5/23-26 (West 2018). It does not expressly provide for the removal of a candidate who has assumed office. Courts have no inherent power to hear election contests and may only do so in the manner dictated by statute. *Pullen v. Mulligan*, 138 Ill. 2d 21, 32 (1990). Thus, it appears the Election Code does not give the circuit court authority to remove a person occupying public office through an election contest.

¶ 41 We note that the supreme court found effectual relief was available and the contestant ultimately prevailed in the judicial election contest involved in *McDunn v. Williams*. *McDunn*, 156

Ill. 2d at 330. In *McDunn*, however, the election contest was not moot due to the case's "unique facts." *Id.* at 325. Specifically, the trial court suppressed the results of the 1990 general election—effectively enjoining certification of Williams' election—and preserved the status quo. *Id.* Thus, Williams had not filled the judicial vacancy at issue. Rather, he occupied the position by appointment until the vacancy was filled. So, when the supreme court rendered its decision in favor of McDunn and ordered that she be installed, the court did not remove Williams from office. His appointment expired under its own terms. Thus, *McDunn* did not pose the question of removal of a sitting judge, as we face here. No court enjoined certification of Fallon's election or otherwise prevented her from taking office. The status quo was not preserved.

¶ 42  The historical method to remove a person who is illegally occupying a public office is to obtain a judgment of ouster through an action in *quo warranto*. *Goral v. Dart*, 2020 IL 125085, ¶ 79; see *Snowball v. People ex rel. Grupe*, 147 Ill. 260 (1893) (affirming judgment of ouster in *quo warranto* proceeding following successful election contest). Our supreme court contemplated that a *quo warranto* proceeding was the appropriate action to oust a trial court judge alleged to be unlawfully holding the office in *People ex rel. Jonas v. Schlaeger*, 381 Ill. 146, 156 (1942). The *Jonas* decision, however, predated our current state constitution. The Illinois Constitution of 1970 vests authority to remove a sitting judge in the Courts Commission. Ill. Const. 1970, art. VI, § 15(e)(1). It is unclear whether the Court's Commission's authority to remove a judge is exclusive.

¶ 43  Nevertheless, a judgment declaring a judicial election contestant duly elected would seem to be a prerequisite to pursue the removal of a sitting judge—either through a *quo warranto* proceeding or a complaint filed with the Judicial Inquiry Board—on the basis that the sitting judge was not duly elected. Thus, while an election contest would not afford DiFranco complete relief,

a declaration that he was duly elected would be necessary for the ultimate remedy he seeks—removing Fallon and assuming office. For that reason, a favorable judgment would have a practical effect. Therefore, we find this matter is justiciable and not moot.

¶ 44                                    B. Leave to File an Amended Petition

¶ 45        We next address DiFranco's claim that the trial court abused its discretion in denying his motion for leave to file an amended petition. The general principle liberally allowing for amendments before a final judgment is entered in civil cases applies in election contests. *In re Durkin*, 299 Ill. App. 3d 192, 203 (1998). A party's right to amend a pleading, however, is not absolute. *Avila v. Chicago Transit Authority*, 2021 IL App (1st) 190636, ¶ 56. The decision whether to grant leave to amend a pleading rests within the sound discretion of the circuit court. *Atlas v. Mayer Hoffman McCann, P.C.*, 2019 IL App (1st) 180939, ¶ 39. We will not reverse the circuit court's decision absent an abuse of discretion. *I.C.S. Illinois, Inc. v. Waste Management of Illinois, Inc.*, 403 Ill. App. 3d 211, 219 (2010).

¶ 46        When reviewing whether the circuit court abused its discretion, we consider the following *Loyola* factors: " '(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified.' " *Hayes Mechanical, Inc. v. First Industrial, L.P.*, 351 Ill. App. 3d 1, 7 (2004) (quoting *Loyola Academy*, 146 Ill. 2d at 273). Our primary consideration, however, is whether amendment would further the ends of justice. *Id.* If so, denial of leave to amend is an abuse of discretion. *Atlas*, 2019 IL App (1st) 180939, ¶ 39.

¶ 47        As the circuit court observed here, the new allegations asserted in DiFranco's proposed amendment did not cure defects in his original claims but instead addressed the deficiency

identified in the respondents' then-pending motion for summary judgment. The court went on to explain that the proposed petition "identifie[d] several thousand more votes, which, if disallowed, may be sufficient to change the outcome of the election." Later, the court described the proposed amendment as a new set of claims.

¶ 48    Asserting new bases to contest an election, rather than curing defects in an initial election contest petition, makes a crucial difference. In general, when a proposed amendment seeks to add a new claim for relief based on different facts—instead of curing a defect in an original pleading— the first *Loyola* factor is not satisfied. See *United Conveyor Corp. v. Allstate Insurance Co.*, 2017 IL App (1st) 162314, ¶ 40 (finding amendment properly denied when the plaintiff's amended complaint added a new cause of action instead of curing a defective pleading). In election contests, courts have allowed amendments when the amendment maintains the same grounds previously stated but alleges more detail to support those grounds or the amendment otherwise corrects technical matters. 26 Am. Jur. 2d *Elections* § 414 (May 2023 Update). Such amendments relate back to the original petition. *Id.* But when the amendment contains allegations and grounds to contest the election that did not appear in the original pleading, courts have generally refused to allow amendment. *Id.*

¶ 49    Here, DiFranco asserts the allegations in his proposed amendment were not new claims but merely clarified his original claims since all his claims were premised on the same provisions of the Election Code. We disagree. The Election Code requires a person desiring to contest an election to file a verified petition "setting forth *the points* on which [they] will contest the election." (Emphasis added.) 10 ILCS 5/23-20 (West 2018). DiFranco's original petition sets forth certain points on which he would contest the election, mainly improperly counted ballots based on the discrepancy between the number of VBM ballots counted and the number of VBM ballot return

envelopes the Clerk produced. In his proposed amended petition, DiFranco did not cure any defect in the "points" he originally pled for contesting the election. Rather, DiFranco's proposed amended petition sought to assert new "points" on which he would contest the election—the Clerk's preprinted certification varying from the statutory form, incomplete voter residency certification, illegible signatures, and so on. None of those new allegations related to the number of VBM ballot return envelopes or any other point raised in DiFranco's original petition. These were entirely new factual bases for contesting the election. Since his proposed amended petition would not cure a defective pleading, DiFranco failed to demonstrate the first *Loyola* factor.

¶ 50 Moreover, we believe amendment to add new claims in an election contest after the 30-day period for filing such an action should be highly disfavored. See *id.* (providing that an election contestant must file within 30 days after the elected person is declared elected). Election contests are unlike the typical litigation brought before the courts. *Carey v. Elrod*, 49 Ill. 2d 464, 470 (1971). Such actions are intended to be disposed of promptly (*Waupoose v. Kusper*, 8 Ill. App. 3d 668, 671 (1972)) and the public has an interest in the stability and finality of election results (29 C.J.S. Elections § 467 (Aug. 2023 Update); see *Doelling v. Board of Education of Community School District No. 88*, 17 Ill. 2d 145, 146 (1959) ("In election contests there must be finality ***.")). "[E]lection contests are meant to afford a simple and speedy means of contesting elections to stated offices and to achieve a full and fair litigation of election disputes in an expeditious manner." 26 Am. Jur. 2d *Elections* § 384 (May 2023 Update). A losing candidate using an election contest to search for new grounds to overturn an election through protracted litigation when the initial bases of the contest lack merit, as DiFranco attempted here, undermines the stability and finality of the election result as well as the expedient disposition of the contest. See *Zahray v. Emricson*, 25 Ill. 2d 121, 124 (1962) ("the proceeding cannot be employed to allow a party, on

mere suspicion, to have the ballots opened and subjected to scrutiny to find evidence upon which to make a tangible charge").

¶ 51 We further find that allowing amendment in this case would not further the ends of justice. An amendment does not further the ends of justice if it fails to state a viable cause of action. *Hayes Mechanical*, 351 Ill. App. 3d at 7. "[W]hen ruling on a motion to amend, the court may consider the ultimate efficacy of a claim as stated in a proposed amended pleading." *Id.* DiFranco's proposed amendment sought to contest the election on the grounds that (1) the Clerk's preprinted certification did not conform to the prescribed form provided in section 19-5 of the Election Code (10 ILCS 5/19-5 (West 2018)), (2) the years and months spaces to state the voter's length of residency were not completed on 6350 envelopes, (3) 25 envelopes had no signature, and (4) 1811 envelopes were either signed by another member of the voter's household or the signature was illegible. These allegations fail to demonstrate a reasonable likelihood that a recount would change the result of the election.

¶ 52 Election authorities are to furnish voters voting by mail with envelopes bearing a printed certification "substantially" in the form set forth in section 19-5 (*id.*), stating, in relevant part, "I have lived at such address for …. months last past." For the 2020 general election, the Clerk furnished envelopes with a printed certification reading, in relevant part, "I certify that I have (or will have) lived at the following address for at least 30 days before Election Day. I have lived here for ___ years and ___ months." In substance, both versions convey that the voter meets the residency requirement to vote in the election district, which is 30 days preceding the election. See *id.* § 3-1. So, we find the Clerk's version is substantially in the form provided in section 19-5.

¶ 53 Apart from that, the Clerk's deviation does not invalidate the ballots. "Strict compliance with all applicable provisions in the Election Code is not necessary *** to sustain a particular

ballot." *Calloway v. Chicago Board of Election Commissioners*, 2020 IL App (1st) 191603, ¶ 11. "Failure to comply with a mandatory provision renders the affected ballots void, whereas technical violations of directory provisions do not affect the validity of the affected ballots." *Id.* A provision of the Election Code is mandatory if the statute " 'expressly states that failure to act in the manner set out in the statute will void the ballot.' " *Id.* ¶ 18 (quoting *Pullen*, 138 Ill. 2d at 46). But if the provision simply prescribes the performance of certain acts in a specified manner without an express consequence in the event of noncompliance, the provision will generally be deemed directory. *Id.* ¶¶ 18-19. Section 19-5 does not expressly state that ballots are invalid if the ballot envelope lacks a certification in the form set forth in the statute. Nor does DiFranco direct us to any provision of the Election Code supporting that conclusion. Thus, we construe section 19-5 as directory. Accordingly, any claimed noncompliance with the statute cannot result in disqualification of the affected ballots.

¶ 54 We also observe that the Clerk's version was redundant since the number of years and months a voter resided at their address is irrelevant if they have lived there for 30 days before the election. With the preprinted certification already stating so, voters could reasonably consider it unnecessary to complete the number of years and months. Thus, "incomplete residency" on 6350 envelopes did not render those ballots illegal.

¶ 55 Additionally, DiFranco claims that 25 envelopes lacked a signature and 1811 envelopes were either "signed by a member of the household other than the named voter, included the handwritten notation 'REMAKE' or 'Deceased' on the return envelope, or had wholly illegible signatures." DiFranco groups the 1811 envelopes with these claimed defects as "other irregularities." We find DiFranco's allegations related to voter signatures are insufficient to establish that any of these 1836 ballots should have been disqualified.

¶ 56    The General Assembly enacted Public Act 101-642 (eff. Jun. 16, 2020) to temporarily amend the Election Code for the Conduct of the 2020 General Election. Public Act 101-642 provided that "any vote by mail ballot received by an election authority shall be presumed to meet the requirements of Articles 17, 18, and 19 and the voter shall be deemed otherwise qualified to cast a vote by mail ballot unless deemed invalid as provided in [section 2B-20]." *Id.* § 10 (adding 10 ILCS 5/2B-20(b)). The election authority was to submit received VBM ballots to panels of three election judges to compare signatures and verify that the voter was duly registered and had not already cast a ballot. *Id.* § 10 (adding 10 ILCS 5/2B-20(c)). A VBM ballot could only be rejected if all three judges voted to reject the ballot for any of five enumerated reasons: (1) that the signatures did not match, or the envelope was unsigned, (2) the ballot envelope was delivered opened, (3) the voter had already cast a ballot, (4) the voter voted in person on election day, or (5) the voter was not duly registered in the precinct. *Id.* If the ballot was rejected, the election authority was required to notify the voter. *Id.* § 10 (adding 10 ILCS 5/2B-20(d)). If the ballot was rejected based on the signature or lack thereof, the voter could submit a statement asserting that they cast the ballot. *Id.* Upon receipt of the voter's statement, the ballot was to be determined valid and counted. *Id.* Accordingly, a nonmatching signature on a return envelope did not disqualify a ballot *per se*. Rather, it was a basis only to reject a ballot preliminarily, subject to voter affirmation.

¶ 57    Although DiFranco's brief acknowledges these provisions of Public Act 101-642 governed the 2020 General Election, he fails to explain how the irregularities he claims should have disqualified the affected ballots. We presume that DiFranco means to argue that the 1836 ballot envelopes should have been rejected for nonmatching signatures or lack of a signature. However, the plain language of Public Act 101-642 assigned review of envelope signatures to the discretion of panels of elections judges, and the presumption of a match could only be overcome by the

unanimous decision of all three. Since the election judges' decisions were discretionary acts, we find those decisions are not judicially reviewable.

¶ 58      "Where the legislature leaves a matter to executive discretion, *** the judiciary may not interfere with such discretion under normal circumstances without offending the principle of separation of powers." *Bigelow Group, Inc. v. Rickert*, 377 Ill. App. 3d 165, 173 (2007). Thus, "discretionary acts of public officials carrying out their duties are not subject to review by the judiciary" unless the public official abuses their discretion "or if fraud, corruption, or gross injustice underlying the discretionary act is shown." *Illinois Federation of Teachers v. Board of Trustees*, 191 Ill. App. 3d 769, 773 (1989). "[A] court should concern itself with discretionary acts of the other branches of government only where such acts may violate the law or where the empowering legislative act calls for such judicial review." *Bigelow Group*, 377 Ill. App. 3d at 174.

¶ 59      Here, DiFranco's proposed amended petition makes no allegations to support that any fraud, corruption, or gross injustice was involved in the election judges' comparison of signatures. And judicial review for an abuse of their discretion is impractical. The Election Code and Public Act 101-642 provide no criteria for determining whether signatures match. There is no standard to apply. See *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 498 (1988) (observing that whether a statute contains "standards, goals, or criteria by which a court may evaluate agency action" is a factor in determining the reviewability of an agency's action). Illegibility is not a basis to invalidate a signature, and virtually anything counts as a signature. See 80 C.J.S. *Signatures* § 9 (Aug. 2023 Update) ("An illegible signature will not affect the validity of an instrument."); Black's Law Dictionary 1387 (7th ed. 1999) (defining "signature" as "A person's name or mark written by that person or at the person's direction."). Any recount procedure would amount to substituting

the reviewer's judgment for that of the election judges.[7] We do not believe the legislature intended for such a procedure to occur in a recount. Instead, the Election Code defers to the judgment of the election judges. Since the legislature gave no direction on how to compare signatures and assigned the determination to the election judges, we believe the legislature intended for their judgment to be final and not judicially reviewable. *Cf.* 10 ILCS 5/19-8(g-5) (West 2018) (expressly providing that election judges' determination as to the validity of contested vote by mail ballots is unreviewable). Accordingly, VBM ballots cannot be invalidated based on the election judges' discretionary decisions regarding the envelope signatures.

¶ 60        In addition, DiFranco's allegations do not foreclose that ballots may have been initially rejected for the very reasons he points out but later properly counted if the voter submitted a statement that they cast the ballot. See Public Act 101-642 § 10 (eff. June 16, 2020) (adding 10 ILCS 5/2B-20(d)). Election judges are presumed to have performed their statutory duties. *McDunn*, 156 Ill. 2d at 318. Further, invalidating ballots in a recount based on the signature would deprive the voter of their right to affirm that they cast the ballot.

¶ 61        We further observe that the voter's signature on a VBM return envelope is just one among several overlapping measures in the Election Code aimed at ensuring that only votes of qualified electors are counted. To be sure, the fact that voters reside in the election district, among other things, is what qualifies them to vote—not whether they have certified so. At no point did DiFranco make allegations—or offer proof—to demonstrate that even a single ballot was counted that was not cast by a duly qualified voter.

¶ 62        Accordingly, we find DiFranco's proposed amended petition failed to allege facts demonstrating a reasonable likelihood that a recount would change the result of the election. To

---

[7]Or the "judgment" of a computer. DiFranco's counsel suggested to the trial court that artificial intelligence (AI) software could be used for signature comparison.

be sure, none of the irregularities he claimed are bases to categorically disqualify votes. When a proposed amendment fails to state a viable claim, courts need not proceed with further analysis of the *Loyola* factors. *Hayes Mechanical*, 351 Ill. App. 3d at 7. Since we find the amended petition legally insufficient, we conclude that the circuit court did not abuse its discretion in denying leave to file an amended petition. Having resolved the issue on these grounds, we need not consider the parties' other contentions.

¶ 63                                B. Summary Judgment

¶ 64        Next, we consider DiFranco's claim that the circuit court erred in granting the respondents' motion for summary judgment. "The purpose of summary judgment is not to try a question of fact, but to determine if one exists." *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). "Summary judgment is to be encouraged in the interest of prompt disposition of lawsuits, but as a drastic measure it should be allowed only when a moving party's right to it is clear and free from doubt." *Pyne v. Witmer*, 129 Ill. 2d 351, 358 (1989). We review the circuit court's grant of summary judgment *de novo*. *First American Bank v. Poplar Creek, LLC*, 2020 IL App (1st) 192450, ¶ 20. "Summary judgment is proper where the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Jones v. Live Nation Entertainment, Inc.*, 2016 IL App (1st) 152923, ¶ 28.

¶ 65        A defendant moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The defendant meets their burden either by (1) affirmatively demonstrating that some element of the case must be resolved in their favor or (2) establishing the plaintiff lacks sufficient evidence to prove an essential element of the cause of action. *Williams v. Covenant Medical Center*, 316 Ill. App. 3d 682, 688 (2000).

¶ 66    If a defendant satisfies the initial burden, the burden shifts to the plaintiff to present a factual basis that would arguably entitle that party to a favorable judgment. *Nedzvekas*, 374 Ill. App. 3d at 624. "While a plaintiff does not need to prove its entire case during summary judgment, it must present some evidentiary facts as support for its cause of action." *National Tractor Parts Inc. v. Caterpillar Logistics Inc.*, 2020 IL App (2d) 181056, ¶ 38. However, the plaintiff must present a *bona fide* factual issue. *Morrissey v. Arlington Park Racecourse, LLC*, 404 Ill. App. 3d 711, 724 (2010). Specifically, the plaintiff must either demonstrate that a genuine issue of material fact exists—that material facts are disputed—or that reasonable people could draw different inferences from the undisputed facts. *Illinois Insurance Guaranty Fund v. Priority Transportation, Inc.*, 2019 IL App (1st) 181454, ¶ 53. The plaintiff cannot rely on general conclusions of law or allegations in their pleading to raise a genuine issue of material fact. *Morrissey*, 404 Ill. App. 3d at 724; *800 South Wells Commercial LLC v. Cadden*, 2018 IL App (1st) 162882, ¶ 26. Likewise, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999).

¶ 67    Among other arguments in his brief, DiFranco contends the trial court's order granting summary judgment "disregarded the allegations" of his petition and "ignored section 23-23.2 of the Election Code." That statute provides: "A court hearing an election contest pursuant to this Article or any other provision of the  law shall grant a petition for a recount properly filed where, *based on the facts alleged in  such petition*, there appears a reasonable likelihood the recount will change the results of   the election." (Emphasis added.) 10 ILCS 5/23-23.2 (West 2018). DiFranco appears to argue he was entitled to a recount based on the allegations in his petition alone and the court should not have considered the evidence submitted in connection with the motion for summary judgment. Though not spelled out, DiFranco's argument implies that section 23-23.2

confines the court to consider only the petition's allegations, taken as true on their face, in deciding whether to order a recount. In other words, DiFranco would have us interpret section 23-23.2 to mean that a contestant need only make out a legally sufficient petition to ensure the petition cannot be challenged by a motion for summary judgment. We reject this interpretation.

¶ 68     The primary objective in construing a statute is to ascertain and give effect to the intention of the legislature. *Cothron v. White Castle System, Inc.*, 2023 IL 128004, ¶ 20. The best indicator of legislative intent is the statute's language itself, given its plain and ordinary meaning. *Id.* When the language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction. *Id.* In determining legislative intent, we may also consider the consequences that would result from construing the statute one way or the other. In doing so, we presume that the legislature did not intend absurd, inconvenient, or unjust consequences. *Home Star Bank & Financial Services v. Emergency Care & Health Organization, Ltd.*, 2014 IL 115526, ¶ 24.

¶ 69     The plain language of section 23-23.2 calls upon the circuit court to determine the reasonable likelihood that a recount would change an election result "based on the facts alleged in the petition." However, the statute does not identify a particular procedure for making this determination, and the phrase "based on the facts alleged in the petition" is arguably ambiguous. "A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses." *Id.* A court's determination "based on the facts alleged in the petition" could either mean (1) the court merely determines whether the petition's factual allegations, taken as true, are sufficient or (2) the court determines whether the allegations are sufficient subject to any procedures the litigants invoke as would normally be available in civil ligation. In the former sense, the court would be limited to the four corners of the petition. But in the latter sense, the court could consider evidence offered by the litigants supporting or refuting

the allegations, such as occurs when reviewing a motion for summary judgment. In either sense, the court's decision would be "based on the facts alleged in the petition."

¶ 70    When a statute contains ambiguous language, we may look to tools of interpretation, such as the doctrine of *in pari materia*, to ascertain the meaning of a provision. *People v. Taylor*, 221 Ill. 2d 157, 163 (2006). The doctrine of *in pari materia* directs us to consider two statutes on the same subject with reference to each other to give them harmonious effect. *Id.* at 161 n.1. Section 23-23 of the Election Code (10 ILCS 5/23-23 (West 2018)) provides that election contests "shall be tried in like manner as other civil cases." Applying the Statute on Statutes (5 ILCS 70/0.01 *et seq.* (West 2006)), this court has found that the Election Code's reference to "other civil cases" "incorporate[s] into election contest cases the provisions contained in the Civil Practice Law." *Peet v. Voots*, 386 Ill. App. 3d 404, 407 (2008); see 5 ILCS 70/1.22 (West 2018) (" 'Other civil cases' *** shall be deemed to refer to cases under the Civil Practice Law *** and the Supreme Court Rules ***."). The Civil Practice Law is contained in article II of the Code of Civil Procedure (735 ILCS 5/2-101 *et seq.* (West 2018)). *Peet*, 386 Ill. App. 3d at 407; see 735 ILCS 5/1-101 (West 2018). Article II includes a provision allowing litigants to move for summary judgment. 735 ILCS 5/2-1005 (West 2018). Therefore, to give harmonious effect to section 23-23 and section 23-23.2, we find that a petition may be challenged by a motion for summary judgment before a court determines whether to grant a recount.

¶ 71    Turning to DiFranco's other contentions, he complains that the respondents' motion "failed to identify a legal basis for summary judgment." We disagree. The legal basis was obvious, and the respondents' motion stated it explicitly—a recount would not likely result in a different election outcome. DiFranco's responses and the court's decision reveal the legal basis for the motion was not lost on them. We need not address this argument further.

¶ 72        DiFranco offers several arguments attacking whether VBM envelope images were proper evidence to support the respondents' motion. He alternatively contends that the VBM envelope images (1) were not properly submitted to the court as exhibits, (2) were not properly authenticated, and (3) were not admissible under the public records hearsay exception (Ill. R. Evid. 803(8) (eff. Jan. 25, 2023)).

¶ 73        As to submission, DiFranco notes that the envelope images were stored on a drive maintained by the law firm representing the Clerk and accessible by hyperlinks embedded in the electronic copies of certain documents filed in the case. DiFranco contends this method failed to introduce the envelope images into evidence since, as he posits, the Clerk of Courts Act (see 705 ILCS 105/16(6) (West 2018)) contemplates that the court clerk must be able to take custody of any filed documents and make them available for public access. We need not determine whether hyperlinks to items stored on a private drive is a proper method of introducing exhibits to support a motion. In addition to the hyperlinks, the record demonstrates that the Clerk also submitted the images via USB flash drive. The court clerk can take custody of such drives, and courts have long accepted exhibits submitted in this format. In our view, the hyperlinks were akin to a courtesy copy provided for convenience.

¶ 74        As to authentication, DiFranco alleges Nally's certification is deficient under Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013) for failing to set forth the basis of his personal knowledge that the images were true and correct copies of the VBM return envelopes kept by the Clerk. Indeed, Nally's certification fails to do so. DiFranco, however, did not raise this precise objection before the trial court. A party cannot attack the sufficiency of an affidavit for the first time on appeal. *Andrews v. At World Properties, LLC*, 2023 IL App (1st) 220950, ¶ 30. Below, DiFranco argued that Nally's certification was deficient since the Clerk's counsel stated in an

email communication that Nally did not personally count the envelopes. That argument challenged the fact of whether Nally had sufficient personal knowledge to authenticate the images, not whether his certification was deficient on its face, as he argues on appeal.

¶ 75    Notwithstanding that issue, the record apart from Nally's certification was sufficient to authenticate the VBM envelope images. "[T]he bar for authentication of evidence is not particularly high." (Internal quotation marks omitted.) *People v. Watts*, 2022 IL App (4th) 210590, ¶ 82. "[T]he standard for authentication, and hence for admissibility, is one of reasonable likelihood" that the evidence is what it is purported to be. (Internal quotation marks omitted.) *People v. Reynolds*, 2021 IL App (1st) 181227, ¶ 57; see Ill. Evid R. 901(a) (eff. Sep. 17, 2019) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."). As the trial court noted, Michalowski testified in his deposition that the envelopes were scanned after being received. Additionally, the images themselves support their authenticity. The distinctive characteristics of an item taken in conjunction with the circumstances may serve as evidence of authentication. Ill. Evid. R. 901(b)(4) (eff. Sep. 17, 2019). As the trial court noted, each image shows an election envelope in the same form bearing the title "Official Suburban Cook County Ballot Return Envelope" as well as bar codes, date stamps, and printed names of voters. The images also indicate the voter's precinct. Indeed, Melo's affidavit included a spreadsheet in which she tallied the number of envelope images by each of the 52 precincts in the discovery recount. Thus, the respondents demonstrated a reasonable probability that the images were authentic copies of the VBM return envelopes for the 52 precincts included in the discovery recount. DiFranco offered no evidence to refute their authenticity. We reject his contention that the Clerk's redactions negated their authenticity. "In general, most editing will not render evidence

inadmissible but rather will go to the weight of that evidence." *People v. Taylor*, 2011 IL 110067, ¶ 44.

¶ 76    We also observe DiFranco's argument that the VBM envelope images do not meet the public records hearsay exception is irrelevant because they are not hearsay. Though the respondents cited the hearsay exception in their motion, the images were not offered for the truth of any matter asserted on the envelopes. The envelopes themselves were offered solely to demonstrate their existence.

¶ 77    We turn to consider the motion for summary judgment itself. Although our review is *de novo*, our consideration of the motion leads to the same reasoning and conclusion the trial court reached. By the time the motion was taken under advisement, DiFranco's sole claim was that VBM ballots were improperly counted since the ballots were submitted without the required return envelope. Notably, DiFranco produced no direct evidence demonstrating this occurred. To be sure, the Clerk's answers to DiFranco's interrogatories and Michalowski's deposition testimony indicated that no VBM ballots without a return envelope were received by the Clerk or counted. Further, we presume that election officials complied with their statutory duties in the conduct of an election. *Pullen*, 138 Ill. 2d at 67. To rebut that presumption and the respondents' evidence, DiFranco relies on the inference that some VBM ballots lacking a return envelope were improperly counted since the number of VBM ballots included in the final canvass is greater than the number of VBM ballots the Clerk later produced in discovery. Viewing the evidence in the light most favorable to DiFranco as the nonmoving party, we must consider the discrepancy as evidence that some VBM ballots were improperly counted.

¶ 78    Evidence of some improperly counted ballots alone, however, is insufficient to prevail in an election contest: there must be enough to make a difference. *Goree v. LaVelle*, 169 Ill. App. 3d

696, 700 (1988) ("The irregularities complained of after an election must be of such magnitude that, if proved, would show that but for the irregularities, the election result would have been different, or that, if the irregularities were proved, would impose a duty on a court to void the election."). Initially, DiFranco claimed 3628 VBM ballots were improperly counted in the precincts included in the discovery recount. The Clerk submitted evidence that there were only 115 fewer envelopes than VBM ballots. Thus, DiFranco could not rely on the allegation of 3628 missing envelopes asserted in his petition to demonstrate a genuine issue of material fact and avoid summary judgment. *Triple R Development, LLC v. Golfview Apartments I, L.P.*, 2012 IL App (4th) 100956, ¶ 16 ("Once the movant produces evidence that, if uncontradicted, would entitle it to a directed verdict at trial, the burden of production shifts to the party opposing the motion. The nonmovant may not simply rely on his pleadings to raise issues of material fact."). DiFranco countered with Mezo's affidavit asserting that the accurate tally shows the discrepancy was 439. Like the trial court, viewing the evidence in the light most favorable to DiFranco leads us to use the number 439 in our analysis.

¶ 79        Fallon won by 502 votes, so disqualifying 439 improperly counted ballots could not possibly change the outcome of the election. However, this figure only represents the discrepancy of VBM ballots and envelopes in the precincts included in the discovery recount, not the entire 12th subcircuit. DiFranco's petition posited that the precincts included in the discovery recount are representative of the whole subcircuit, so the same percentage of ballots missing a return envelope could be expected for the entire subcircuit in a recount.

¶ 80        In *In re Contest of the Election for the Offices of Governor & Lieutenant Governor Held at the General Election on November 2, 1982*, 93 Ill. 2d 463, 490 (1983) (*In re Contest*), our supreme court disapproved of using the results of a discovery recount to project changes in vote

totals in other precincts when seeking a recount. Rather, the petitioner was required to make specific allegations regarding those precincts. *Id.* When *In re Contest* was decided, however, the common law required an election contest petition to clearly allege that a recount would in fact change the result. *Andrews v. Powell*, 365 Ill. App. 3d 513, 519 (2006). The legislature subsequently amended the Election Code to require only that the facts alleged demonstrate a " 'reasonable likelihood' " that a recount would change the result. *Id.* (quoting 10 ILCS 5/23-23.2 (West 2004)).

¶ 81　　　　After recognizing the pleading standard was made less strict since *In re Contest*, the Fourth District stated: "The law and practice that has developed concerning discovery recounts and recountpetitions provides that the results of the discovery recount are to be mathematically extrapolated to interpret whether the facts discovered during the discovery stage are significant." *Id* at 521. The *Andrews* court cited *Cummings v. Marcin*, 16 Ill. App. 3d 18, 22 (1973) to support the proposition, but *Cummings* does not appear to do so. That case concerned a ballot proposition in a single precinct and did not involve a discovery recount. *Id.* Thus, there is little legal authority supporting the projection methodology in DiFranco's petition.

¶ 82　　　　We also observe that DiFranco selected which precincts would be included in the discovery recount. They are not a random sample. A party seeking a discovery recount generally selects the precincts they believe would yield the most favorable results. See *In re Contest*, 93 Ill. 2d at 491. So, a projection based on the discovery recount results for the entire 12th subcircuit could be biased by DiFranco's selection.

¶ 83　　　　Nevertheless, in keeping with viewing the evidence in the light most favorable to DiFranco, we will project the same percentage of counted VBM ballots without envelopes for the whole subcircuit. As the trial court calculated, 439 is 1.954% of the 22,461 total VBM ballots counted in

the 52 precincts of the discovery recount. Projection leads to an expected 1398 improperly counted ballots for the entire 12th subcircuit if a recount were conducted.

¶ 84    If irregular ballots are easily distinguishable and no fraud is involved, exclusion of the ballots from the total tally is a simple remedy. *Hileman v. McGinness*, 316 Ill. App. 3d 868, 870 (2000). Here, the ballots and envelopes were separated, making it impossible to determine which VBM ballots were improperly counted and for which candidate they were cast. Thus, exclusion is not a possible remedy. *Id.* When the number of invalid votes can be ascertained, but it cannot be determined for whom the votes were cast, the proper remedy is to apportion the votes among the candidates. *Qualkinbush v. Skubisz*, 357 Ill. App. 3d 594, 624 (2004).

¶ 85    Illinois courts have apportioned illegal votes by the proportion that each candidate received in the precincts where the illegal votes were cast. *In re Durkin*, 299 Ill. App. 3d at 200-01. DiFranco's petition, however, proposed apportioning the improperly counted ballots by the proportion of the VBM votes each candidate received across the entire 12th subcircuit. Presumably, he proposed this method since Fallon received over 60% of VBM ballots cast. Thus, a proportionate reduction using DiFranco's proposed method would be more advantageous to DiFranco than apportion based on results in each precinct. Indeed, in the precincts where he received more votes, his reduction would be greater than Fallon's and reduce his relative gain in the precincts where Fallon received more votes. So, DiFranco's proposed method would avoid his relative loss of votes in the precincts he won and ensure a relative gain—that Fallon's total would be reduced more than DiFranco's.

¶ 86    The trial court aptly described DiFranco's proposed method to apportion votes as novel. We need not determine whether DiFranco's proposed method is appropriate, however, since, even

applying his method, DiFranco would not overcome his 502-vote deficit, as the trial court's calculations demonstrated.

¶ 87    DiFranco nonetheless argues the trial court applied an incorrect standard, requiring him to show a mathematical certainty that a recount would change the result of the election rather than a reasonable likelihood. We disagree. The analysis afforded DiFranco a view of the evidence in the light most favorable to him. We took the discrepancy of the number of VBM envelopes produced versus the number of VBM ballots counted as evidence that VBM ballots without a return envelope were received and counted, despite the Clerk's assertion that did not occur at all. We took the number of missing VBM envelopes as 439 instead of 115. And we projected the same percentage of missing envelopes for the 52 discovery recount precincts to the remaining three-quarters of the 12th subcircuit, despite reasons that the discovery recount precincts may not be representative of the entire subcircuit. In addition, using DiFranco's proposed apportionment method not only viewed the *evidence* in the light most favorable to him, but also the *law*, as precedent would have called for apportioning votes by precinct results. Despite all those advantages, DiFranco fell short of the votes he needed to overcome Fallon's lead. In other words, even giving DiFranco every favorable assumption, he would not surpass Fallon's vote total. The necessary conclusion, then, is there is no reasonable likelihood that a recount would change the outcome of the election.

¶ 88    For these reasons, we find no genuine issue of material fact exists and the respondents are entitled to judgment as a matter of law.

¶ 89                                III. CONCLUSION

¶ 90    Based on the foregoing, we affirm the judgment of the trial court.

¶ 91    Affirmed.

---

*DiFranco v. Fallon*, **2023 IL App (1st) 220785**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-COEL-032; the Hon. Patrick T. Stanton, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Kenneth A. Michaels Jr., of Bauch & Michaels, LLC, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Steven M. Laduzinsky and Natalie K. Wilkins, of Laduzinsky & Associates P.C., and Michael J. Kasper, of Kasper & Nottage, P.C., both of Chicago, for appellees. |

---